## Richmond

### James Lee Simpson

### v.

### Commonwealth of Virginia

Record No. 830596.

June 15, 1984.

Present: All the Justices.

558

*Stanley E. Sacks (Sacks, Sacks & Larkin,* on brief), for appellant.

*Karen A. Laserson, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

James Lee Simpson was convicted, in a bench trial, of capital murder, possession of a sawed-off shotgun, conspiracy to commit a felony, and use of a firearm in the commission of a felony. He was sentenced to life imprisonment for capital murder, forty years for the shotgun offense, ten years for conspiracy, and one year for the firearm offense. His appeal raises questions as to the admissibility of his confession, the admissibility of certain evidence under exceptions to the hearsay rule, the sufficiency of proof of conspiracy, and the sufficiency of proof of a completed robbery, as an element of capital murder.

The evidence will be stated in the light most favorable to the Commonwealth. On the afternoon of January 22, 1982, three young men, Daniel Boomer, Nathaniel Moses ("Buggie"), and the defendant ("Bubba"), were riding around Norfolk in Buggie's car. Boomer had a sawed-off shotgun and the defendant had a knife. They discussed a plan to rob a cab driver whereby Boomer and Bubba would enter a cab, and order the driver to take them to a location near the house of Boomer's mother, who was Bubba's sister. Buggie would follow in his car and, after the robbery of the cab driver, furnish transportation whereby Boomer and Bubba would flee from the scene.

The three first went to the Greyhound bus station in downtown Norfolk, but failed to find a suitable victim. They proceeded to

the Trailways bus station, again failed to find a victim, and returned to the Greyhound station. There, Boomer and the defendant entered the rear seat of a Yellow Cab driven by Thomas R. Tabron. They directed Tabron to the 7000 block of Gregory Drive in Norfolk, where they arrived about 2:45 p.m. When Tabron stopped the cab at the address to which they had directed him, Boomer produced the sawed-off shotgun, which he had hidden in his clothing, and the defendant produced a knife.

The defendant, reaching over the front seat, stabbed Tabron in the chest. Tabron repeatedly pleaded, "Please don't kill me." The defendant held Tabron by the collar of his shirt, demanded money, and then stabbed Tabron again several times. Tabron struggled out of his heavy winter shirt and sweater and escaped from the cab, running to the front yard of a nearby house, where he collapsed. Boomer wrapped the shotgun in Tabron's shirt and sweater, and both men ran from the scene. Buggie failed to appear with the getaway car, so they ran to the defendant's sister's house where they hid the shotgun and stolen clothing in the attic. Before attacking Tabron, the defendant had produced his own wallet, pretending to look for money to pay the cab fare. It contained his identification and that of his sister, Boomer's mother. In the struggle he dropped it and left it in the back seat of the cab.

At about 3:05 p.m., Officer Applewhite of the Norfolk police observed Tabron's empty cab parked in the street with all doors closed, but with the engine still running. Blood was visible on the driver's door and the rear door on the driver's side. A citizen called down the street, asking the officer to come to a house at 7000 Gregory Drive, a short distance from the cab. There, Applewhite found Tabron, a fifty year old black man, lying on his back. There was a large amount of blood on his chest and on his legs. About a dollar in change was scattered around his body. No other money was on his person or in the cab. Other police officers arrived promptly.

Tabron was still conscious, but was terrified and confused. As the police spoke to him, he said, "Don't hurt me. Don't hurt me." Applewhite said, "We're not going to hurt you. We're police officers. We're trying to help you." Tabron, however, responded, "Don't hurt me. Please don't let them hurt me. I've been robbed, I've been robbed. They took my money." Applewhite asked him to describe the robbers. Tabron replied, "Three black males. One of them had a sawed-off shotgun."

Tabron, despite the January weather, was clad above the waist only in a white T-shirt, soaked with blood. A paramedic team took him to St. Paul Hospital, where he was found to have three stab wounds, one in the left shoulder area, one in the middle of the sternum, and one in the area of the left nipple. One of the wounds penetrated the heart lining and caused extensive internal bleeding. This condition was repaired by prompt surgery, but Tabron remained in the hospital on a "downhill course." He had been suffering from "rather severe" coronary arteriosclerosis, and, within twenty-four to forty-eight hours after the assault, suffered a heart attack. Complications arising from this event caused the onset of pneumonia, which caused his death fifteen days later, on February 6.

On February 8, Dr. William Massello, a pathologist and assistant medical examiner, performed an autopsy. In his opinion, Tabron's death was "caused by complications which resulted from three stab wounds to the front of the chest."

The defendant and Boomer were arrested at Boomer's home around midnight on the day of the offense. The defendant was found hiding in the attic. Boomer retrieved the victim's sweater from the attic, retrieved the shotgun from his girlfriend's car, where he had hidden it, and led the police to the remnant of the shotgun barrel, which he dropped into a sewer. They arrived at the police station around 12:35 a.m., January 23. At approximately 2:30 a.m., Detective McMahan read the standard *Miranda* warnings to the defendant, who signed a written waiver form and said that he was willing to discuss the case with the police without benefit of counsel. The defendant then made a statement to Detective McMahan in which he essentially denied any involvement with the crimes.

About twelve hours later, at 2:30 p.m. on January 23, Detective Stein removed the defendant from his cell and took him to his office. He showed the defendant the knife with which Tabron had been stabbed, as well as the defendant's wallet which had been removed from the cab. He told the defendant that "two other people had been arrested that he knew and had given us statements." Stein said he wanted to know the defendant's side of the story if the defendant wanted to tell him. But, Stein said, he told the defendant that "he didn't have to if he didn't want to;" the decision whether to talk was up to him. At this point the defendant said that he wanted to make a statement. Stein then read to him the

full text of the *Miranda* warnings again, from the same form Detective McMahan had used. The defendant again waived his rights and made an oral statement to Stein, admitting his involvement in the crimes. Stein then called in a stenographer, at about 3:00 a.m., advised the defendant of his *Miranda* rights for the third time, and took his oral responses indicating his willingness to discuss the case without counsel, all of which the stenographer recorded. The defendant made a detailed confession. After it had been typed, Stein read each page to the defendant, who initialled them. The confession was introduced in evidence at trial.

Prior to trial, the defendant was evaluated by Dr. William M. Lee, a forensic clinical psychologist, and by Dr. James C. Dimitris, a psychiatrist and Forensic Unit Director at Central State Hospital. These witnesses found that the defendant was of borderline intelligence, having an I.Q. of seventy-eight. He was twenty years old and had grown up in Hyde County, North Carolina. He had completed the eighth grade, but functioned at the second-grade level. He could read only a few simple words, but could read his name. He could sign his name, but could write other words only by copying them. He was not psychotic, however, and showed no sign of brain damage. Dr. Lee testified that his memory was good, he was in full touch with reality, and had "pretty good common sense," or "street sense." In Dr. Lee's opinion, he was capable of making an intelligent choice whether to talk to the police and would not confess to something he had not done. Neither expert found any evidence of stress or coercion in the record of the interview with Stein. In the opinion of Dr. Dimitris, the defendant might fail to comprehend a word like "waive," but he would clearly understand Stein's plain language when he was told that he "didn't have to [talk] if he didn't want to."

The defendant made a motion to suppress the confession taken by Stein, on the grounds that he had been insufficiently warned and that there was no evidence that he had knowingly and intelligently waived his rights. After a lengthy hearing, at which the defendant testified, the court denied the motion. This ruling is challenged on appeal.

The defendant also assigns error to the court's ruling that Tabron's statements to Officer Applewhite were admissible under the "excited utterance" exception to the hearsay rule; to the court's ruling admitting the opinion of Dr. Massello, the medical examiner, which was based in part upon hospital records not in

evidence; and to the court's ruling admitting the Yellow Cab Company's business records as circumstantial proof that money was taken from the victim. The defendant further argues that there was insufficient evidence of a completed robbery and of conspiracy.

■ The defendant's relatively low intelligence and defective education are factors which should be weighed, along with all surrounding circumstances, in determining whether he voluntarily and intelligently waived his constitutional rights, and whether his confession was voluntary. *Akers* v. *Commonwealth*, 216 Va. 40, 46, 216 S.E.2d 28, 32 (1975).

The trial court, aided by the testimony of the experts, the witnesses who observed the surrounding circumstances, and the defendant himself, conducted a careful inquiry into these issues. We are satisfied from our review of the record that the trial court's finding of voluntariness is abundantly supported by the evidence. Simpson conceded that he was not coerced in any way. The *Miranda* warnings were read to him three times, in clear and simple language. His waivers were clear and explicit. Further, the statements of Detective Stein amplified the warnings in words which, in the expert's opinion, Simpson could not fail to understand. Aware of Simpson's poor education, Stein read each page of his statement back to him and received his assent. In the expert's opinion, Simpson had too much "street sense" to confess to something he had not done. This conclusion, as well as Simpson's full awareness of his predicament, is reinforced by the disingenuous statement Simpson gave McMahan two hours after his arrest. We agree with the trial court's finding that Simpson's waivers, as well as his subsequent confession, were voluntarily and intelligently made.

■ The defendant assigns error to the trial court's admission of Tabron's declarations to the police under the "excited utterance" exception to the hearsay rule. The defendant points out that Tabron's declarations were made between twenty and thirty minutes after he had been stabbed, and argues that we have never before held a declaration admissible under the "excited utterance" exception which was made so long after the event it purports to describe. The Commonwealth responds that the test of admissibility is not simply the interval between the event and the declaration, but rather, whether the surrounding circumstances constitute a guarantee of trustworthiness. The declarant's mental state must

be shown to have been such that his declaration amounted to the event speaking through the witness, rather than the witness describing the event. *Doe* v. *Thomas*, 227 Va. 466, 318 S.E.2d 382 (1984) (this day decided).

■ We need not decide this question. The identity of the robbers is established by the testimony of Boomer and by the defendant's own confession. The only other purpose for the admission of Tabron's declaration was to show a completed robbery — "I've been robbed . . . [t]hey took my money" — as an element of capital murder. As subsequent discussion will indicate, this element was abundantly proved by other evidence. Thus, the admission of Tabron's declaration, if error, was harmless beyond a reasonable doubt. *See Goins* v. *Commonwealth*, 218 Va. 285, 288, 237 S.E.2d 136, 138 (1977).

■ William Massello, M.D., an assistant State Medical Examiner, qualified as an expert pathologist. The Commonwealth offered his opinion as to the sequence of events leading to Tabron's death. Dr. Massello stated that the knife wounds had caused extensive blood loss from the heart, causing the heart to stop temporarily; that the heart was started again through surgery, but that certain heart tissue lost its vitality during the time of stoppage, causing poor heart function thereafter; that this poor function resulted in a diminished supply of oxygen to the brain, causing brain damage which led to coma; that coma led to pneumonia; and that pneumonia further impaired the ability of the body to absorb oxygen, constituting the immediate cause of death.

On cross-examination, Dr. Massello admitted that his opinion was based upon his observations at the autopsy, which he conducted personally; his medical experience and training; the medical examiner's investigative report of death, which was in evidence; and the records of St. Paul Hospital, which were not in evidence. Simpson moved to strike the opinion, which was the only evidence relating Tabron's death to the crime, because of its partial reliance upon the hospital records.

■ Simpson points out that we have held that an "expert may give an opinion based upon his own knowledge of facts disclosed in his testimony or he may give an opinion based upon facts in evidence assumed in a hypothetical question." *Walrod* v. *Matthews*, 210 Va. 382, 388, 171 S.E.2d 180, 185 (1969). Generally, an expert witness in Virginia has not been permitted to base his opinion on facts not in evidence. *Ortiz* v. *Barrett*, 222 Va. 118,

130, 278 S.E.2d 833, 839 (1981); *Meade* v. *Belcher*, 212 Va. 796, 801, 188 S.E.2d 211, 214 (1972). The Commonwealth, however, urges us to adopt, in substance, the view of the Federal Rules of Evidence, which would permit an expert to base his opinion on facts made known or perceived by him at or before trial, whether admissible in themselves or not, provided they are facts of a type normally relied on by other experts in the field. *See* Fed. R. Evid. 703 and 705.

We are unwilling to accept this invitation. The General Assembly, in 1982, enacted Code § 8.01-401.1 which essentially adopts the foregoing provisions of the Federal Rules of Evidence. That statute's application is expressly limited to "any civil action." We regard this limitation as a clear expression of legislative intent to retain the historic restrictions upon expert testimony in criminal cases in Virginia. *See generally* C. Friend, The Law of Evidence in Virginia § 217 (2d ed. 1983).

■ Our examination of the record, however, reveals a sufficient factual basis for the admission of Dr. Massello's opinion without reference to the hospital records. Based entirely upon his personal observations of Tabron's body at the autopsy, his experience and training, and the exhibits in evidence, he was able to testify that the deceased had suffered three stab wounds to the chest, one of which had penetrated the heart and its lining, causing severe internal bleeding; that the knife in evidence, which Simpson admitted using, was consistent with these wounds; that the victim's internal bleeding was controlled by prompt surgery, but that he had nevertheless suffered a heart attack within approximately forty-eight hours after the stabbing; that such an attack was a highly likely consequence of a penetrating stab wound to the chest of a patient of Tabron's age and with his observed degree of arteriosclerosis; that he had remained in the hospital on a steadily "downhill course" and with a poor prognosis; and that his death resulted from pneumonia which was itself a common complication of the preceding events. This foundation was more than sufficient to support the expert's opinion, and the opinion was more than sufficient to support the fact-finder's conclusion that the stab wounds inflicted by Simpson caused Tabron's death.

■ The court admitted, over the defendant's objection, the testimony of Martha Hayes, a bookkeeper for the Yellow Cab Company. She testified to contemporaneous recordings of the meter readings on Tabron's cab, taken in the ordinary course of

business at the beginning and at the end of the day of the crime. These readings show, in dollars and cents, the fares earned by each driver in the course of his day's work. They are recorded and compared daily with the fares turned in to the company by the driver. They were offered as circumstantial proof of the amount of money Tabron should have had in his possession at the time of the crime. According to the recorded readings on Tabron's meter, this sum would have amounted to $64.40. A comparison between that amount and the small change remaining in Tabron's possession after the crime furnished circumstances from which the fact-finder might infer that a completed robbery had taken place. The records were shown to have been business records, recorded in the regular course of business, contemporaneously made, within the authority of the person recording them, authenticated by their authorized custodian, and based upon information related, in the regular course of business, by one who had personal knowledge of their content. This is sufficient foundation for the admissibility of business records. *See* Friend, at § 235. The defendant points to no defect in the foundation for the admission of this evidence. It was correctly admitted, under the "business records" exception to the hearsay rule, as evidence of the truth of its content.

 Moreover, the taking of the victim's shirt and sweater, by violence and against his will, is in itself sufficient to constitute a robbery. These items are presumed to have some value, and no particular value need be shown. *Pierce* v. *Commonwealth*, 205 Va. 528, 532, 138 S.E.2d 28, 31 (1964). Although a completed robbery must be shown by the evidence to support a conviction of capital murder, *Ball* v. *Commonwealth*, 221 Va. 754, 757, 273 S.E.2d 790, 792 (1981), we hold that the evidence here is more than sufficient to support the trial court's finding in this respect.

 The defendant challenges the sufficiency of the evidence to prove conspiracy. A criminal conspiracy is merely an agreement between two or more persons to commit a crime. *Harris's Case*, 113 Va. 746, 749, 73 S.E. 561, 562 (1912). Here, according to Boomer's testimony, the three criminals had agreed, long in advance of the crime on a detailed plan for the robbery of a cab driver. Their conduct thereafter was further evidence of the agreement. They drove to several locations in search of a suitable victim. The defendant's confession, while differing in some details, corroborates the existence of such an agreement. Moreover, Boomer testified that the defendant had earlier sawed off the shot-

gun barrel to facilitate its concealment for the purpose of such a robbery, and that he, Boomer, concealed it in his clothing in preparation to carry out their joint scheme. We hold that the evidence sufficiently supported Simpson's conspiracy conviction.

Finding no reversible error in the record, we will affirm the convictions.

*Affirmed.*