## Norfolk

GEORGE BENJAMIN PAPUCHIS

v.

COMMONWEALTH OF VIRGINIA

No. 0202-91-2

Decided October 20, 1992

COUNSEL

Winston G. Snider, for appellant.

Margaret Ann B. Walker, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**KOONTZ, C.J.**—In a bench trial, George Benjamin Papuchis (Papuchis) was convicted of operating an illegal gambling enterprise, in violation of Code § 18.2-328, on October 28, 1989, October 29, 1989, November 19, 1989, and November 29, 1989, respectively. On appeal, he alleges that (1) the trial court erred in admitting three sports publications into evidence, and (2) the evidence was insufficient to support the convictions. For the reasons that follow, we hold that the trial court committed reversible error in admitting the publications into evidence.

On March 28, 1990, pursuant to an anonymous Crime Solver's tip, Detectives Christian and Smith of the Virginia Beach Police Department seized the contents of trash cans at the curbside at 629 Kenneth Road. Among the evidence seized were a letter addressed to Papuchis and some sheets of paper, later determined to be betting sheets. The betting sheets had names, numbers and codes. Based on the items seized during the trash pickup, a search warrant for the residence was obtained.

On April 2, 1990, Officers Christian and Mathieson executed the search warrant for the residence. The house was owned by Papuchis' mother, and Papuchis and at least two other individuals lived there. During the search of the residence, the officers discovered papers in Papuchis' bedroom, which were similar to the betting sheets found in the trash outside the residence.

On April 11, 1990, Detective Mathieson placed a telephone call to an unpublished number, alleged by the anonymous informant to be the telephone number of Papuchis' residence. Mathieson asked for "George," and the person answering the call identified himself as "George." Mathieson recognized the voice, and identified "George" as Papuchis, having previously been at his home during the execution of the search warrant. A tape recording and transcript of this conversation were admitted into evidence.

Following the telephone call, a second search warrant was executed at Papuchis' residence. Papers with the same names, numbers and types of codes as those on the sheets from the trash were seized from Papuchis' bedroom.

Detective Huston was qualified at trial as an expert witness in sports bookmaking. Huston interpreted the names, numbers and codes on each betting sheet and concluded that Papuchis received illegal wagers on various basketball and football games in the amount of $4,070 on October 28, 1989; $4,730 on October 29, 1989; $2,590 on November 19, 1989; and $3,835 on November 26, 1989. In rendering his opinion, Huston relied upon three sports publications: "Football Action '90," "Don Heinrich's Pro Review '90," and "Las Vegas Schedule, Issue 10." These publications were admitted into evidence, over Papuchis' objection, for the purpose of showing that the betting sheets written by Papuchis corresponded with the 1989-90 football and basketball schedules and the win-loss records.

The first issue before this Court concerns the admissibility of the three sports publications admitted into evidence as Commonwealth's exhibits 4, 5 and 6. Papuchis contends that the admission of these magazines into evidence was reversible error because the materials are hearsay evidence not falling within the purview of an exception to the hearsay rule. The Commonwealth asserts that "even if the [documents] are hearsay," they were properly admitted under the hearsay exception set forth in *Kern v. Commonwealth*, 2 Va. App. 84, 341 S.E.2d 397 (1986).

While the Commonwealth, on brief, appears merely to assume that the materials admitted into evidence as Commonwealth's exhibits 4, 5 and 6 are hearsay evidence, we find they are hearsay evidence. These materials were offered to prove the truth of the team schedules and the win-loss records contained in these materials in order to establish that the sheets written by Papuchis corresponded to actual sport events. Therefore, the publications are admissible only if they satisfy the requirements of admissibility under an exception to the hearsay rule. The Commonwealth alleges that this issue is controlled by our decision in *Kern*, where we recognized an exception to the hearsay rule when an expert relies upon data that is not in evidence for the purpose of developing an opinion in that case. *Id.* at 87-88, 341 S.E.2d at 399.

As a general rule in this Commonwealth in a criminal case, an expert may not "base his opinion on facts not in evidence." *Simpson*

*v. Commonwealth*, 227 Va. 557, 565, 318 S.E.2d 386, 391 (1984). In *Kern*, an expert jewelry appraiser relied upon an unidentified market data brochure, which was not in evidence, for the purpose of valuing a gemstone in a larceny case. The expert examined the gemstone and then referred to the brochure in order to determine the current per-carat value. The expert appraiser testified ''that the brochure was one of several published in her profession, and that its use was standard appraisal practice.'' *Kern*, 2 Va. App. at 87, 341 S.E.2d at 399. We held that the use of objective data customarily relied on by other experts in the field in order to develop an opinion when that data has not been prepared for the sole purpose of arriving at a specific opinion in the case does not mandate exclusion of the expert's opinion. *Id.* at 87-88, 341 S.E.2d at 399. We explained that

> [t]he brochure was prepared as a collection of data customarily available to gemstone appraisers in general. It was analogous to a medical treatise consulted by an expert or to a real estate record consulted by a real estate appraiser. The objective nature of the current market data contained in the brochure lends credence to the trustworthiness of the information.

*Id.*

The holding in *Kern* was subsequently applied in *Funderburk v. Commonwealth*, 6 Va. App. 334, 368 S.E.2d 290 (1988). In *Funderburk*, we considered a forensic serologist's reliance upon published studies concerning population statistics in arriving at an opinion as to the statistical prevalence in the general population of persons possessing the victim's blood characteristics. As in *Kern*, the materials consulted by the expert were not admitted into evidence. The expert testified that she tested the blood samples and then consulted the statistical studies to render her opinion. We noted that the materials consulted by the expert ''are of a type customarily relied upon and consulted by those in her field'' and were not prepared for the sole purpose of arriving at a specific opinion in this case. *Funderburk*, 6 Va. App. at 338, 368 S.E.2d at 292. Applying the hearsay exception recognized in *Kern*, we held that the trial court did not abuse its discretion in permitting the expert to testify to the prevalence in the population of persons possessing the victim's blood type, even though that testimony was based on facts not in evidence. *Id.* at 339, 368 S.E.2d at 292.

The Commonwealth's reliance on *Kern* for the proposition that the sports publications are admissible under an exception to the hearsay rule is misplaced. *Kern* does not authorize a trial court to admit into evidence hearsay materials relied on by experts in developing an opinion. Rather, that case involved the admissibility of an expert's testimony when materials on which he or she relied were not in evidence. *Kern*, therefore, does not stand for the proposition that hearsay materials relied on by an expert may be admitted into evidence in a criminal case. Because the Commonwealth has failed to establish that the sports publications were admissible under an exception to the hearsay rule, we find that the trial court erred in admitting these materials into evidence.

■ However, the question remains as to whether Huston was permitted to rely on this inadmissible hearsay evidence in developing his opinion, under the authority of *Kern*. Even though the sports publications were inadmissible, Huston may rely upon facts not in evidence for the purpose of developing an opinion in the case if the evidence is of a type customarily relied upon by other experts in the field of sports betting and was not prepared for the sole purpose of arriving at a specific opinion in this case. *See Funderburk*, 6 Va. App. at 338, 368 S.E.2d at 292; *Kern*, 2 Va. App. at 87-88, 341 S.E.2d at 399. Accordingly, we now decide whether Huston's reliance on this evidence was permissible.

In both *Kern* and *Funderburk*, the materials used by the experts for the purpose of arriving at an opinion in the case were of a type customarily relied upon and consulted by other experts in the field. *Funderburk*, 6 Va. App. at 338, 368 S.E.2d at 292; *Kern*, 2 Va. App. at 87-88, 341 S.E.2d at 399. In this case, however, no evidence in the record establishes that these publications were customarily relied upon by other experts in the field.

Huston relied exclusively upon "Football Action '90" to determine team schedules and win-loss records for college football. When asked by the court if this publication was one upon which experts in the field would normally rely to establish schedules of teams, Huston responded that a "Las Vegas schedule book," which he did not have, is typically relied upon by experts in the field to verify team schedules. For establishing the schedules of the professional football games, Huston relied upon "Don Heinrich's Pro Review '90." When directly questioned by the Commonwealth's attorney, Huston was unable to state that this was a publication normally relied on by experts in the field of

sports betting. Furthermore, with regard to the "Las Vegas Basketball Schedules, Issue No. 10," Huston did not testify that this is a publication relied upon by experts in the field to determine basketball schedules for the season. Therefore, the record fails to show whether these publications were customarily relied upon by other experts in the field.

In sum, because the sports publications admitted into evidence were hearsay and did not fall within any recognized exception to the hearsay rule, the trial court erred in admitting these publications into evidence. Moreover, the Commonwealth's contention that the expert's opinion testimony, which was based in part on inadmissible hearsay evidence, is nonetheless valid under the authority of *Kern*, is without merit. In the absence of evidence that these publications were of a type customarily relied upon by experts in the field, Huston's reliance on these materials was improper.

■ Having found that the trial court erred in admitting the sports publications, we now turn to the issue of whether such error was harmless. The principles for determining whether non-constitutional error is harmless are set forth in *Lavinder v. Commonwealth*, 12 Va. App. 1003, 407 S.E.2d 910 (1991) (en banc):

> In Virginia, non-constitutional error is harmless "[w]hen it *plainly appears* from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached." "[A] fair trial on the merits and substantial justice" are not achieved if an error at trial has affected the verdict. Consequently, . . . a criminal conviction must be reversed unless "it plainly appears from the record and the evidence given at the trial that" the error did not affect the verdict. An error does not affect a verdict if a reviewing court can conclude, without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same.

*Id.* at 1005, 407 S.E.2d at 911 (citations omitted).

Applying these principles in the case before us, we cannot conclude that the error in admitting the sports publications was harmless. The betting sheets found in the trash outside Papuchis' residence and in his bedroom were undated papers containing names, numbers and codes. The Commonwealth sought to prove that these papers were betting sheets. The team schedules and game scores in exhibits 4, 5 and 6 were used to establish that the names, numbers and codes in the papers

referred to the games played and the win-loss records on a certain day.[1] Our review of the record shows that these publications were the primary evidence the Commonwealth presented to establish that the papers found at Papuchis' residence were, in fact, betting sheets. The error mandates reversal of the convictions because these publications, and Huston's testimony, were the principal part of the Commonwealth's case. Based on the record and the evidence at trial, we find that the error affected the verdict.

Accordingly, we reverse and remand without addressing the sufficiency issue.

*Reversed and remanded.*

Benton, J., and Bray, J., concurred.

---

[1] Huston consulted the team schedules and win-loss records listed in the publications to show that the betting sheets written by Papuchis corresponded with the 1989-90 football and basketball schedules. By matching up the bets placed on the betting sheets to the game schedules and win-loss records listed in the publications, Huston was able to determine the dates on which the bets were placed.