Norfolk

BRIAN SCOTT DAVISON

v.

COMMONWEALTH OF VIRGINIA

No. 1401-92-1

Decided June 21, 1994

COUNSEL

Michael P. King, for appellant.

Leah A. Darron, Assistant Attorney General (Stephen D. Rosenthal, Attorney General, on brief), for appellee.

OPINION

**BAKER, J.**—Brian Scott Davison (appellant) appeals from judgments of the Circuit Court of the City of Hampton (trial court) that approved his jury trial convictions for rape, sodomy, inanimate object penetrations, and abduction. He contends (1) that the evidence was insufficient to support his convictions, and (2) that the trial court erroneously admitted testimony given by an expert witness which invaded the province of the jury. For the reasons that follow, we reverse and remand this case for a new trial if the Commonwealth be so advised.

The record contains extensive conflicting evidence raising factual questions that the jury decided adversely to appellant. Upon familiar principles, when sufficiency of the evidence is raised, we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).

Appellant was indicted and convicted for sexual offenses he allegedly committed against his stepdaughters, "H" and "J," on various occasions between May 1988 and November 1990. During that time period, "H" was between ten and twelve years old, and

"J" was between six and eight years old. When they testified at trial, "H" was fourteen years old and "J" was ten years old. The events occurred in their house where they lived with appellant, their natural mother, Lori Lee (Lori), and younger sister, who was born of the marriage between appellant and Lori. At trial, neither child gave specific dates on which the offenses occurred. However, they placed the dates between May 1988 and November 1990 and related the times of the occurrences to other events, such as Mother's Day weekend, Christmas, or other things they were doing when they testified appellant began his sexual abuses.

"H" testified that appellant bound and gagged her, engaged her in sexual and anal intercourse, had oral sodomy with her, and penetrated her vagina with a vibrator. She described sexual intercourse as putting his penis in her vagina.

In late November 1990, "H" told a social worker and the police of a recent incident. Appellant was arrested and jailed. "H" testified that because of previous threats appellant had made and because she was afraid of the economic consequences of appellant's incarceration, she recanted her accusation and appellant was released from jail. Appellant spent Christmas at the family house but left the next day and did not return until June 14, 1991.

In March 1991, "H" told Lori, Police Officer Rogers, and a social worker all of the events she described at trial. In addition, she related the events to a therapist, Julia Canestrari (Canestrari).

"J" testified that appellant began to engage in sexual acts with her sometime during 1989 or 1990, after her half-sister was born in October 1988. She said that the acts began when appellant entered her bed and inserted his fingers into her vagina. "J" corroborated some of "H's" testimony. She said that appellant "stuck his penis in [her] vagina and [her] older sister's vagina." She related that this occurred at a time when they had been watching a video titled, "The Man From Snowy River." In addition, "J" testified that appellant had inserted a magic marker into her vagina, required her to put her mouth on his penis and "just made [her] suck his penis," and penetrated her in a wooded area next to their church.

"J" explained that she did not tell Lori, her natural father, or her grandparents that these acts were being committed upon her because appellant had threatened that if she told anyone, he would take her mother and baby sister "far, far away" and she would never see them again.

Dr. Elliott W. Lucas (Lucas), a gynecologist, whose qualifications were stipulated, examined "H" on September 13, 1991 for evaluation due to a history of sexual assault. Lucas testified that a pelvic examination of "H," then thirteen years old, revealed that she had no hymen and that it was unusual for a child "H's" age to have no hymen. He further testified that this finding was consistent with penetration of the vagina, that "[i]t is possible to be born without [a hymen], but most women are born with one," and that use of tampons "could" be consistent with a hymen breaking. Lucas's examination of "J" revealed that her hymen was "very scarred" and "partially torn," which is usually "consistent with either some type of sexual abuse or use of some type of object."

Canestrari's testimony was proffered by the Commonwealth "as an expert in the field of child abuse" for the purpose of explaining "the phenomenon of recanting in child sexual abuse cases and why that might occur." Canestrari testified that she graduated in 1984 from Randolph-Macon College where her major was in psychology and, in addition, she attained a Master's in Social Work (MSW) from Virginia Commonwealth University in 1988. Canestrari described her current occupation as a "child and adolescence therapist." She had worked in that profession for four years but had not engaged in a particular specialty within that capacity. Canestrari's work consisted of providing "outpatient mental health services to children, adults, and their families, with a variety of issues including depression, major mental illness to trauma to family dynamics." She had provided case management and crisis intervention services, pre-screening children to determine if hospitalization was required, and "referring them to appropriate mental health services, social services, medical services, whatever they needed." Canestrari had received training in sexual abuse cases, one session relating to sexual offenders. Approximately one-third of her case load involved seeing patients for sexual abuse. "H" and "J" were among the patients she saw.

The prosecution proffered Canestrari as an expert to explain the phenomenon of recanting in child sexual abuse cases and why that

might occur. The trial court was further assured by the prosecutor that Canestrari would not testify specifically about these children, only generally about the particular phenomenon, because "recanting" was "an issue in this case." The prosecutor assured the court that Canestrari would be asked no more questions concerning her "seeing 'H' and 'J.' " Appellant's counsel then observed to the trial court, "it looks like to me what they are trying to do is get this lady to come in and say, 'I believe that they are telling the truth and I am an expert and I can explain away recanting.' " The trial court responded to that statement by making the following ruling:

> THE COURT: I tell you what, I'm going to allow her to testify to this phenomenon, but if she goes afield and brings these children into it, I'm going to declare a mistrial.

Appellant's counsel acknowledged his satisfaction with that ruling by saying, "Thank you, Your Honor." At that time, no objection was made to the court's ruling.

To bolster Canestrari's qualifications as an expert witness, the prosecutor asked whether she was "familiar" with the term "*recant*," if she had read any literature or if she were "aware of that phenomenon in regard to child sexual abuse cases," and where she had gained her "knowledge of that phenomenon." Canestrari responded that she had read one article by a psychiatrist that was "used in the field" that "explains the syndrome of why kids recant."

When the prosecutor asked Canestrari to "explain that study," the trial court sustained appellant's objection that requested that she be qualified first. Canestrari was then asked to "explain what recanting is." Appellant objected on the basis that her explanation would be based solely on a single article she had read that was recommended by a co-worker. The court overruled the objection, saying:

> She [has] an MSW and BA in psychology. That is coupled with the training seminars and I think her knowledge would be from other than just reading this one article . . ..

> She testified that she had read the article about it, but she also should be familiar with it from other experiences as

well. That's why I ruled as I did. I note your exception for the record.

Canestrari was then asked if she knew the reasons why "a child who has been sexually abused may recant." Appellant objected to the question as being "overly broad." The trial court overruled that objection and Canestrari responded:

Yes. Children, when they have been hurt in a sexual way, it's usually by a person — a trusted person, a parent or a friend of the family, and the person in that trusted position often uses the threat of, you will lose a family member; I will kill your dog; I will kill your mother, if you tell, and they tell the child on the one hand that, what we are doing is okay, but you can't tell anybody, so in the child's head, they are very confused about what it means and they understand by the secrecy that something's wrong although they're being told it's all okay since this is a person they trust and depend on maybe for food, shelter, clothing, for safety. Usually when they do, in fact, tell that they have been hurt it's out of a moment of anger or in a crisis and all the things that the person has said may come true, you'll lose your mother; I may be sent out; the family will be separated; you won't have food, happens because the family may react to the crisis and, in fact, the father or the perpetrator may be sent out.

At this point, appellant renewed his objection on the ground that Canestrari was "basically going through and reciting everything that [the child] has said." He then objected to "her continuing her testimony." The trial court overruled the objection.

Canestrari then was asked whether there were any other reasons why a child might recant. She gave the following response:

Just plain fear. It's very scary to stand up to an adult system that probably won't believe them. So they are a lot of times afraid, and those may sound real familiar, but that's typical from case to case why kids recant. Although it may apply directly to this case, that's exactly what happens from case to case to case.

In his cross-examination of Canestrari, appellant stated, "[s]ome *people* recant because they lie, too, don't they?" She an-

swered that it is a "possibility" and added, "but the studies show that the majority of the times kids don't lie about it."

Appellant testified and denied every charge made by "H" and "J." He presented the children's mother, Lori, as a hostile witness on his behalf. Lori described a sometimes violent relationship, including a statement that appellant had raped her.

■ Appellant presented other witnesses. However, none supplied evidence that required the trial court to conclude, as a matter of law, that the evidence was insufficient to support the verdicts. Appellant contends that "H's" and "J's" testimony was so incredible that the Commonwealth's evidence is insufficient as a matter of law. We disagree. The trial judge and jury had the opportunity to observe the witnesses, assess their demeanor as they testified, and weigh their testimony. The weight to be given to the evidence is within the province of the fact finder. *See Bridgeman v. Commonwealth*, 3 Va. App. 523, 528, 351 S.E.2d 598, 601-02 (1986). Unless the finding of the trial court is plainly wrong or without evidence to support it, we will not disturb its findings. *See* Code § 8.01-680. Accordingly, we find that the evidence is sufficient to support the verdicts and judgments of the trial court.

■ Appellant does not challenge Canestrari's expertise in the field of sexual abuse of children. Even if, in an appropriate case, Canestrari is considered an expert witness, that would not necessarily ensure the admission of the proffered testimony.[1] *See* 2 Charles E. Friend, *The Law of Evidence in Virginia* §§ 17-18, at 51 (4th ed. 1993). To be admissible in a criminal case, the expert's testimony must meet the requirements stated in *Simpson v. Commonwealth*, 227 Va. 557, 318 S.E.2d 386 (1984); otherwise, the opinion of the expert is of no evidential value. *See* Charles E. Friend, *supra*, at §§ 17-18. When the opinion of the expert is properly admitted, that opinion may be weighed by the fact finder as any other relevant admissible evidence. *McLane v. Commonwealth*, 202 Va. 197, 206, 116 S.E.2d 274, 281 (1960).

■ Code § 8.01-401.3 and its predecessor essentially adopted the Federal Rules of Evidence, allowing experts to base their opinions on facts made known or perceived by them at or before trial,

---

[1] We do not here hold that the witness properly qualified as an expert for the purpose for which her testimony was proffered.

whether such facts are admissible or not, provided they are facts of a type normally relied on by other experts in the field. *Simpson*, 227 Va. at 566, 318 S.E.2d at 391. However, *Simpson* notes that the General Assembly specifically limited Code § 8.01-401.3 to "any civil proceeding," disclosing that the legislature intended to retain the historic restrictions upon expert testimony in criminal cases. *Id*. *Simpson* establishes that an expert may give opinions either " 'based upon his own knowledge of facts disclosed in his testimony or he may give an opinion based upon facts in evidence assumed in a hypothetical question.' " *Id*. at 565, 318 S.E.2d at 391 (quoting *Walrod v. Matthews*, 210 Va. 382, 388, 171 S.E.2d 180, 185 (1969)). At trial, the prosecutor did not ask Canestrari to respond to a hypothetical question, and Canestrari did not, of her own knowledge, possess facts relevant to either the merits of the charges or to the credibility of the recantation made by "H" and, generally, an expert witness in Virginia has not been permitted to base his or her opinion on facts not in the record. *Simpson*, 227 Va. at 565, 318 S.E.2d at 391.

Canestrari was not asked to assume the truth of facts in evidence and then express an opinion based on those facts, nor was she questioned on her personal knowledge of facts relative to this appeal. She was asked to "explain what recant is," to state from her experience in the field of child abuse if it is common for children who have been sexually abused to recant, and whether she knew "what [the] reasons are that a child who has been sexually abused may recant." Canestrari was then permitted to give responses to questions that were not phrased as hypothetical questions and not founded upon her own knowledge of facts relative to the merits of the case. We hold that Canestrari's testimony should not have been weighed by the jury on the merits of the charges or the issue of "H's" credibility.

Appellant further argues that the trial court erred when it permitted Canestrari to testify to matters involving the credibility of "H," an ultimate issue within the province of the jury. We hold that the Commonwealth failed to qualify Canestrari as an expert to explain "the phenomenon of recanting in child sexual abuse cases and why that might occur." We further hold that the "phenomenon" was not established as a principle generally accepted as reliable by the scientific community or among professionals engaged in child sexual abuse cases.

Having degrees in psychology and social work and an acquaintance with a single article, by an author whose qualifications were not shown, did not qualify Canestrari to testify to a principle not proved to be reliable. Moreover, because the purpose of the proffered evidence was to bolster the testimony of the abused child who, at different times preceding the trial, had related diametrically opposite accounts of appellant's guilt, it invaded the province of the jury to decide "H's" credibility.

The credibility of witnesses is a matter for the jury to decide, weighing such factors as the appearance and manner of the witnesses on the stand, their intelligence, their opportunity for knowing the truth and observing the things about which they testify, their interest in the outcome of the case, their bias, and if any had been shown, their prior inconsistent statements and prior criminal convictions.

*Mullis v. Commonwealth*, 3 Va. App. 564, 571, 351 S.E.2d 919, 923 (1987).

■ In proffering Canestrari as an expert, it was the prosecutor's intent to bolster the truth of "H's" testimony at trial. It is well settled that an expert may not "express an opinion as to the veracity of any witness." *Fitzgerald v. Commonwealth*, 223 Va. 615, 630, 292 S.E.2d 798, 806 (1982), *cert. denied*, 459 U.S. 1228 (1983); *Coppola v. Commonwealth*, 220 Va. 243, 252-53, 257 S.E.2d 797, 804 (1979), *cert. denied*, 444 U.S. 1103 (1980). The prosecutor's question to Canestrari specifically concerned the testimony of a "particular . . . witness" and, thus, was clearly "intended to elicit an opinion" of veracity. *See Coppola*, 220 Va. at 252, 257 S.E.2d at 804; *see also Fitzgerald*, 223 Va. at 630, 292 S.E.2d at 806. Such evidence is a comment on an ultimate fact within the province of the jury and must be excluded by the trial court.

Here, on at least one of the occasions that "H" spoke concerning appellant's guilt, her statement was not truthful. Whether "H" spoke the truth when she testified at trial that appellant had sexually molested her was a precise and ultimate issue. A determination of that issue did not require special knowledge or experience. *See Cartera v. Commonwealth*, 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978).

Because we are unable to determine the possible effect the inadmissible testimony may have had upon the jury verdicts, the judgments of the trial court are reversed and the case remanded to the trial court for such further action as the Commonwealth may be advised.

*Reversed and remanded.*

Coleman, J., and Bray, J., concurred.