COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Callins and Frucci
Argued at Lexington, Virginia

RACHEL LEANOR HANDY

v.      Record No. 1240-24-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE RANDOLPH A. BEALES
SEPTEMBER 9, 2025

FROM THE CIRCUIT COURT OF THE CITY OF MARTINSVILLE
G. Carter Greer, Judge

Gregory T. Casker for appellant.

William K. Hamilton, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of the City of Martinsville convicted Rachel Leanor

Handy of one felony count of armed robbery, one felony count of conspiracy to commit armed

robbery, one felony count of conspiracy to use a firearm in the commission of robbery, one felony

count of armed burglary, one felony count of conspiracy to commit armed burglary, one felony

count of conspiracy to use a firearm in the commission of burglary, and two felony counts of using a

firearm in the commission of a felony.  On appeal, Handy challenges the sufficiency of the evidence

to sustain her convictions.

## I.  BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Gerald v.*

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

(2016)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

Handy and her codefendant, Jonathan Lebron, were tried at a joint jury trial. The victim in this case, Joshlyn Hairston (who goes by the nickname "Dee Dee"), testified at the trial. Hairston recalled that on July 5, 2019, Handy "came to my house."[1] Hairston stated that "someone knocked on my door, and I opened it and it was her [Handy]. She showed up at my house." When asked how long Handy was there, Hairston noted, "Less than five minutes," and explained that she gave Handy twenty dollars before she left.

When asked what happened after Handy left, Hairston went on to testify:

> Somebody knocked. I automatically went to the backdoor, opened it and nobody was there. So when I come back through my dining room, I looked and there's a guy standing at my front door. My front door was open. It was July 6th, like 2:00 in the evening. So I walked to the door, and I didn't recognize him, and I thought, well, this is strange. Nobody comes to my front door. They can't get up the hill. He says, "Ma'am, can I use your phone?" I'm thinking to myself, I don't know you. I'm not going to open my door. I said, "I don't have a phone.["] He said, "My car ran out of gas, and it's so hot out here, can I please have some water?" and I said, "Okay, I'm going to give you some water," and I walked to my refrigerator and got out a bottle of water, and when I came back and unlocked the screen to give him the water, he jerked it open and put the gun to my head.

Hairston testified, "He has the gun to my head, and he backed me back on my sofa with the gun right here (Indicating) and he said, 'Give me the money you owe Rachel [Handy].'" Hairston testified that when she told him "I don't owe Rachel [Handy] any money," he responded, "Ms. Dee Dee, I don't want to hurt you. Give me the money that you owe Rachel." She restated that she does

---

[1] Hairston testified that she had received a text or call from Handy earlier, but she did not answer or respond because they were not friends.

not owe Handy any money. When he repeated his demand, she responded, "Rachel just left. I gave her $20. I don't owe her no money. Where is my phone?" Hairston then "jumped up" and he followed her into her room with the gun. Hairston explained, "My phone is laying on the bed. I picked it up. He's got the gun the whole time. I dialed Rachel's number, and Rachel answered." Hairston asked Handy who the man was in her house. Hairston testified that her niece then knocked on the back door, so the man "grabbed my purse off my bed, ran out the front door. I ran out behind him, and that's when the police was coming by the front of my house." Hairston later discovered the man was Zachery Conner.

Lieutenant Ben Peters of the Martinsville Police Department was on patrol near Hairston's house on the same day. Lieutenant Peters "observed a male running from the area driveway" and explained that "he was carrying a bag, or some type of black bag or something in his right arm, and he had a bandana mask down around his neck." After Lieutenant Peters stopped his police vehicle, Hairston approached him and reported that someone had taken her purse.

After speaking with Hairston, Lieutenant Peters reviewed his dash camera footage and noticed "a white Trail Blazer" in a nearby parking lot. On that same day, "[a]bout 40 minutes" later, Lieutenant Peters found that vehicle, and he recalled, "It was being operated by Rachel Handy." A recording that was obtained from the dash camera of Lieutenant Peters's vehicle showed a man running from Hairston's driveway, and it was entered into evidence.

Zachery Conner also testified at the joint jury trial. Conner explained that he was hanging out with Handy and Lebron on July 5, 2019. When asked "[w]hat led up to that conversation" about Hairston, Conner testified, "Something about Dee Dee [Hairston] owing Rachel [Handy] some money, or something like that." Conner further recalled that Handy and Lebron "just asked if I wanted to make some money," but later clarified that "Rachel Handy made the offer at first." Conner explained that Handy "said that Dee Dee owed her some money, and she told me if I could

get it for her, that she would give me some things in return." Counsel for the Commonwealth asked Conner, "So did she tell you how much money Dee Dee owed her?" Conner replied, "No ma'am," but he recalled, "She told me whatever I got, that she would give me half of." Conner clarified, "She [Handy] had told me that Ms. Hairston had some old pills, and I think it was some baggies of some cocaine."

After that conversation, Handy, Lebron, and Conner left the apartment and they entered a "White Chevy SUV." Conner noted, "I was in the backseat," and specified "[b]ehind the driver."[2] Conner testified that Handy told him that there was a Glock style BB gun in the pocket behind the driver's seat. When asked what he did after Handy told him about the BB gun, Conner recalled that he "took it" and "put it in my waistband."

Conner stated, "At first he [Lebron] had dropped me off a couple of blocks away from Dee Dee Hairston's house, and then he had parked in the ballfield park." When asked how he knew which house was Hairston's house, Conner explained, "On the way there, we had passed the house, and Rachel Handy had pointed it out." Conner testified that Hairston answered the door, and he recalled, "I told her that my car had overheated, and I needed some paper towels and a bottle of water." After Hairston returned with a bottle of water, Conner testified that he entered her house and "brandished the firearm in my waistband."

Conner "demanded where the money was that she had owed Rachel," and testified that "[s]he told me where her bag was." Conner testified that he grabbed the bag, which was "under the nightstand beside her bed on the right side of the bed." After grabbing the bag, he recalled, "I took off out the door" and went to the nearby parking lot. Conner got into the vehicle with Handy and Lebron, at which point Handy "gave me half of everything." Conner said that he received "more

---

[2] Conner explained that Lebron was the driver.

pills, and I got a gram of cocaine." He also testified that Handy gave him fifty dollars from Hairston's purse.

After the Commonwealth presented its evidence at trial, Handy's counsel moved to strike the Commonwealth's evidence. Counsel for Handy argued, "There's no evidence that Ms. Handy, in any way, planned, aided, abetted, in any manner the robbery of Ms. Hairston." Her counsel explained that the same argument applied to the burglary charge. Counsel for Handy further argued, "There's no common scheme between my client and Mr. Conner to steal anything from Ms. Hairston." Her counsel asked that the trial court consider that argument for both the charge of conspiracy to commit armed robbery and the charge of conspiracy to commit armed burglary. Finally, Handy's counsel argued that "there is no evidence, again, that my client in any way facilitated, aided and abetted or conspired with Mr. Conner to use a firearm in the commission, or something similar to a firearm in the commission of either felony that she is charged with."[3] The trial court subsequently denied Handy's motion to strike, stating, "The Jury could infer from those facts that Ms. Handy intended that Mr. Conner use what appeared to be a firearm in trying to get the money back from Ms. Hairston."

Handy and Lebron did not present any evidence, and then Handy's counsel renewed his motion to strike the charges, incorporating his previous argument that the evidence was insufficient. The trial court denied the renewed motion to strike.

The jury found Handy guilty of armed robbery, conspiracy to commit armed robbery, conspiracy to use a firearm in the commission of robbery, armed burglary, conspiracy to commit armed burglary, conspiracy to use a firearm in the commission of burglary, and two counts of using a firearm in the commission of a felony. Handy now appeals to this Court.

---

[3] Handy's counsel also argued at trial that "the Commonwealth has failed to establish any evidence that a BB gun is [a] deadly weapon that was implemented in this case," but Handy does not raise that argument on appeal.

## II.  ANALYSIS

The Supreme Court has stated, "When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024).  Indeed, "[w]hen reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (second alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)).  "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (emphasis and alteration in original) (quoting *Pijor*, 294 Va. at 512).  "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (emphasis in original) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).  Thus, "[i]f there is evidence to support the convictions, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial." *Clark v. Commonwealth*, 279 Va. 636, 641 (2010) (quoting *Commonwealth v. Jenkins*, 255 Va. 516, 520 (1998)).

### A.  Principal in the Second Degree

On appeal, Handy argues, "The fact finder erred by finding that the Commonwealth had met its burden in proving beyond a reasonable doubt that the appellant committed the offenses of robbery and conspiracy to commit robbery."  She also argues, "The fact finder erred by finding that the Commonwealth had met its burden in proving beyond a reasonable doubt that the appellant committed the offenses of armed statutory burglary and conspiracy to commit armed statutory burglary."  In addition, Handy argues,

> The fact finder erred in finding that the Commonwealth had met its burden in proving beyond a reasonable doubt that the appellant committed the offenses of use of a firearm in the commission of a robbery, use of a firearm while committing a breaking and entering, conspiring to use a firearm in the commission of a robbery and conspiring to use a firearm in the commission of a breaking and entering.

Handy contends that the evidence was insufficient to sustain her convictions as a principal in the second degree, because "there was no evidence presented that the defendant was present at the time Mr. Conner robbed Ms. Hairston."[4] Handy further argues, "There is no evidence that she was in a place to incite, encourage, advise or assist in the commission of the crime."

"A principal in the second degree is one not the perpetrator, but present, aiding and abetting the act done, or keeping watch or guard at some convenient distance." *Carr v. Commonwealth*, 69 Va. App. 106, 114 (2018) (quoting *Brown v. Commonwealth*, 130 Va. 733, 736 (1921)). "To find a defendant guilty as a principal in the second degree, the Commonwealth must establish that the defendant procured, encouraged, countenanced, or approved the criminal act." *McMorris v. Commonwealth*, 276 Va. 500, 505 (2008) (citing *Augustine v. Commonwealth*, 226 Va. 120, 124 (1983)). "Mere presence is not sufficient to convict a defendant as a principal in the second degree." *Id.* "The Commonwealth must prove that the defendant consented to the felonious purpose and the defendant contributed to its execution." *Id.* The Supreme Court has stated, "It is a well-settled rule that a defendant is guilty as a principal in the second degree if he is guilty of some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal committing the crime." *Id.*

---

[4] Handy does not argue on appeal that Conner did not commit the crimes of robbery, burglary, and use of a firearm in the commission of a felony. Therefore, we only address Handy's arguments that the evidence was insufficient to establish that she was a principal in the second degree.

> [T]he *presence* need not be a strict, actual, immediate presence, such a presence as would make [the defendant] an eye or ear witness of what passes, but may be a constructive presence. So that if several persons set out together . . . upon one common design, be it murder or other felony, or for any other purpose unlawful in itself, and each takes the part assigned him; . . . they are all, provided the fact be committed, in the eyes of the law, present at it . . . .

*Washington v. Commonwealth*, 43 Va. App. 291, 306-07 (2004) (emphasis and alterations in original) (quoting *Sutton v. Commonwealth*, 228 Va. 654, 667 (1985)).

In this case, Handy "procured, encouraged, countenanced," and "approved the criminal act." *See McMorris*, 276 Va. at 505. Handy initiated the robbery and burglary by presenting the idea to Conner. She promised Conner half of whatever he took from Hairston, which encouraged Conner's participation in the crime. Handy and Lebron transported Conner in the same vehicle that Lieutenant Peters saw Handy operating 40 minutes after Conner left Hairston's house. Thus, the jury could have inferred that Handy was present in the vehicle with Conner and Lebron earlier that day. Conner testified that Handy pointed out Hairston's house as the target, and a rational factfinder could determine that, by that act, Handy was aiding or encouraging Conner's criminal actions.

Furthermore, Handy provided Conner with a Glock style BB gun to use during the crime when she pointed out the BB gun in the back pocket of the seat in front of Conner. Handy had already presented the idea of taking money and pills from Hairston, which Conner had accepted, so by pointing out the gun to Conner, Handy was indeed encouraging Conner to use it for their plan. A rational factfinder could determine that by directing Conner to the gun, Handy was aiding Conner's criminal act by helping him procure the Glock style BB gun for use in the commission of a felony.

In short, we hold that given the record before this Court, a rational factfinder could indeed find that Handy was a principal in the second degree. Therefore, we certainly cannot say that the

trial court erred in denying Handy's motions to strike—or that the jury, as the finder of fact, was plainly wrong or without credible evidence in finding that Handy was a principal in the second degree for armed robbery, armed burglary, and using a firearm in the commission of a felony (both for armed robbery and for armed burglary).

## B. Conspiracy

Handy next argues, "There was no agreement between the defendant and Mr. Conner for Mr. Conner to rob Ms. Hairston to get her money back and the conspiracy conviction should be reversed and dismissed." Handy further argues, "Like in the robbery conspiracy charge, there was no agreement between the defendant and Mr. Conner for Mr. Conner to arm himself with a BB gun and break into Ms. Hairston's home." Finally, Handy argues, "As in the robbery and statutory burglary charges, there was no agreement between the defendant and Mr. Conner as to how Mr. Conner would get the defendant's money back."

"A criminal conspiracy is merely an agreement between two or more persons to commit a crime." *Antle v. Commonwealth*, 83 Va. App. 485, 513 (2025) (quoting *Simpson v. Commonwealth*, 227 Va. 557, 567 (1984)). "Conspiracy 'requires knowledge of and voluntary participation in' the agreement to carry out the criminal act." *Id.* (quoting *Carr*, 69 Va. App. at 117). "Mere participation in the crime is insufficient to prove conspiracy; '[t]he agreement is the essence of the conspiracy offense.'" *Id.* (alteration in original) (quoting *Carr*, 69 Va. App. at 118). "Proof of an explicit agreement is not required and the requisite agreement may be established by circumstantial evidence." *Jones v. Commonwealth*, 279 Va. 295, 301 (2010).

In this case, there was evidence that Handy and Conner agreed to commit the crimes of robbery, burglary, and use of a firearm in the commission of a felony. Conner testified that "Rachel Handy made the offer at first." He also testified that Handy "said that Dee Dee owed her some money, and she told me if I could get it for her, that she would give me some things in

- 9 -

return." Conner stated that he agreed to Handy's idea and that he, Handy, and Lebron then went to perform the crimes.

Conner explained that he did not know where Hairston lived until Handy pointed out the house. He also said that Handy and Lebron dropped him off "a couple of blocks away." A rational factfinder could determine that if Conner was simply going to ask for Handy's property from Hairston, Handy and Lebron could have dropped him off at the door, but Handy and Lebron did not wait for Conner at the house but in a nearby parking lot. A rational factfinder could determine that Handy's actions were consistent with a conspiracy to rob Hairston.

Handy also told Conner about some old pills and cocaine in Hairston's home that he should take even though there is no evidence in the record that the old pills and cocaine in Hairston's home belonged to Handy.

Furthermore, by pointing out to Conner the Glock style BB gun that was in the vehicle in which they were traveling to Hairston's home, Handy indicated an agreement for him to use it in the crimes on which she and Conner had already agreed. A rational factfinder could indeed determine that Handy conspired with Conner to use a firearm in the commission of the armed robbery and armed burglary because she had directed him to the gun that she had in the vehicle when they were traveling to Hairston's house to commit the crimes. The circumstantial evidence was enough for a rational factfinder to conclude that Handy conspired with Conner to use a firearm in the commission of the felonies. *See Jones*, 279 Va. at 301 ("Proof of an explicit agreement is not required and the requisite agreement may be established by circumstantial evidence.").

In short, a rational factfinder could determine that Handy conspired with Conner to break into Hairston's home and to rob Hairston because Handy proposed the idea of taking Hairston's money, pointed out Hairston's house to Conner, dropped Conner off and waited for him, and

encouraged Conner to take other items that Handy did not claim to own.  Therefore, we certainly cannot say that no rational factfinder could have found that Handy conspired with Conner to commit these crimes, and we do not disturb Handy's convictions for conspiracy.

### III.  CONCLUSION

For all of the foregoing reasons, we affirm the judgment of the trial court, and we uphold each of Handy's convictions.

*Affirmed.*