COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Bray and Bumgardner
Argued at Salem, Virginia


LIVINGSTON PRITCHETT, III, S/K/A
 LIVINGSTON BUD PRITCHETT, III
                                      MEMORANDUM OPINION[*] BY
v.    Record No. 1430-99-3       JUDGE RUDOLPH BUMGARDNER, III
                                         DECEMBER 12, 2000
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
                         Ray W. Grubbs, Judge

              Cliff Harrison (James C. Turk, Jr.;
              Frederick M. Kellerman, Jr.; Stone,
              Harrison & Turk, P.C.; Long, Long &
              Kellerman, P.C., on briefs), for appellant.

              Stephen R. McCullough, Assistant Attorney
              General (Mark L. Earley, Attorney General, on
              brief), for appellee.


     Livingston Pritchett, III was indicted for capital murder,

use of a firearm in the commission of a murder, robbery, and use

of a firearm in the commission of robbery.  A jury convicted him

of first degree murder and of each of the related charges.  The

defendant contends that his rights under Miranda v. Arizona, 384

U.S. 436 (1966), were not read to him, his request for an

attorney was not honored, and his confession was coerced.  He

also contends the trial court erred in excluding expert

---

     [*] Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

testimony on his mental retardation.  Finding no error, we affirm.

Viewed in the light most favorable to the Commonwealth, Estel Singleton, Sr. was murdered the night of April 29, 1997 and his body was found early the next morning at an interstate rest stop.  His wallet laid three to four feet from his body and contained no credit or ATM cards.  A single gunshot from a pistol pressed tightly against the victim's temple caused death.

A witness saw the defendant at the rest area and a car similar to the one the defendant owned.  He was videotaped using the victim's ATM card shortly after the murder.  Later in the morning, the defendant made two purchases using the victim's J.C. Penney charge card and signing the victim's name to the charge slip.  In the defendant's motel room, the police found numerous items belonging to the victim, the items purchased at J.C. Penney, and the murder weapon.

Police believed the defendant was the person shown using the victim's ATM card.  Under the pretense of reviewing an earlier trial in which the defendant testified for the Commonwealth, the police got the defendant to go to the state police district office in Salem.

The defendant drove himself to a meeting with First Sergeant Jerry Humphreys.  They discussed the earlier case for about thirty minutes.  Then Humphreys asked the defendant if he had heard about the Singleton murder.  Humphreys told the

-

defendant he resembled a composite of the suspect who used Singleton's ATM card.  The defendant admitted using the ATM card.  Humphreys suggested the defendant take a polygraph examination to eliminate himself as a suspect.  The defendant agreed to that and went out in the hall where he remained alone for 30-40 minutes awaiting the test.

The polygraph examiner, Agent John McDowell, had the defendant sign a written consent to the test and a written form waiving his Miranda rights before beginning the examination. Upon its completion, McDowell told the defendant he had failed. McDowell suggested the courts would probably look better upon him if he admitted it because he would be showing some remorse. The defendant remarked, "I think I might need an attorney" to McDowell.  McDowell concluded the examination and left the room.

First Sergeant Humphreys and Investigator Norman Croy entered the room and showed the defendant the video taken at the ATM machine.  The defendant admitted being the person shown using the ATM card, but maintained he found it in front of a Kroger store.  After the officers asked what had gone wrong at the rest stop, the defendant stated angrily that Singleton was a "faggot."  The defendant continued that he was in the restroom when Singleton entered, made a racial slur, and pulled a gun. The defendant ran, but during a struggle, Singleton fell, and his gun discharged.  The defendant then added that he picked

-

Singleton's ATM card off the ground and later threw the gun in the dumpster at Kroger.

The defendant contends he was in custody and should have been given his Miranda rights. The defendant only made one incriminating statement before he executed the written Miranda waiver form. He admitted that he used the victim's ATM card. When the defendant made that statement, he was not in custody. Though the police used a ruse to get him to the state police headquarters, the defendant went there voluntarily. He was never restrained or subjected to a strong police presence. The defendant had regularly associated with police officers in Roanoke and was comfortable around officers.

Police are not required to give Miranda warnings every time they question a suspect, even when the interrogation takes place at the police station, Bailey v. Commonwealth, 259 Va. 723, 745-46, 529 S.E.2d 570, 583 (2000), petition for cert. filed, __ U.S.L.W. __, (Sept. 6, 2000) (No. 00-6045), or "the investigation has focused on the defendant." Bosworth v. Commonwealth, 7 Va. App. 567, 573, 375 S.E.2d 756, 759 (1989) (citation omitted). "'By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Coleman v. Commonwealth, 226 Va. 31, 46, 307 S.E.2d 864, 872 (1983) (quoting Miranda, 384

-

U.S. at 444).  In this case, the defendant was not in custody when he made his first statement about the ATM card.

After the defendant stated he used the ATM card, he agreed to take the polygraph examination.  The defendant sat alone in the hallway for approximately 40 minutes and never asked to leave.  Humphreys still did not think he had sufficient evidence to hold the defendant for the murder, and the defendant was free to leave.

Before administering the polygraph examination, Agent McDowell advised the defendant of his Miranda rights.  The defendant consented in writing to the test and also executed a written waiver of his Miranda rights.  The trial court found the waiver was voluntarily and intelligently made, and the evidence supports the finding.  When Humphreys and Croy interrogated him after the polygraph test, the defendant was acting pursuant to that waiver.

This case is similar to Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  The defendant voluntarily went to the police station at their request.  When he arrived, he was told he was not under arrest.  The officer told the defendant he wanted to talk about a burglary, which the police believed he had committed, and falsely told the defendant his fingerprints had been found at the scene.  The defendant admitted he took the property.  Then the defendant received Miranda warnings, gave a taped confession, and left the station without incident.  The

-

United States Supreme Court ruled the defendant was not in custody or deprived of his freedom.

Next, the defendant contends he invoked his right to counsel, but the police did not honor his requests. The defendant made two references to getting an attorney: "I think I might need an attorney," and later, "if I'm going to be arrested, I need an attorney." The defendant made the first statement after the polygraph examiner told him he had failed the test. The phrase joined the auxiliary verb "might" to the verb "need" to express possibility. When introduced by "I think," the meaning indicated a thought in process, but not yet concluded. The speaker was still considering or weighing the decision, was still testing alternatives. The statement was not a clear, unambiguous request for counsel.

The second reference to an attorney was also inconclusive. The statement, "if I'm going to be arrested, I need an attorney," is a conditional sentence. The subordinate clause "if I'm going to be arrested," established a condition upon the main clause. The statement told the police that if they were going to arrest the defendant, he wanted an attorney. Such a conditional statement was not a clear, unambiguous request.

Law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). However, the defendant must make an

-

unequivocal request.  Davis v. United States, 512 U.S. 452, 458-60 (1994).  We hold that the defendant never made an unequivocal request for counsel.

The defendant also contends the trial court erred in finding he confessed voluntarily.  He argues the techniques used by the police were coercive when considered with the defendant's low level of intelligence.  "The Commonwealth has the burden to prove, by a preponderance of the evidence, that a defendant's confession was freely and voluntarily given."  Bottenfield v. Commonwealth, 25 Va. App. 316, 323, 487 S.E.2d 883, 887 (1997).

When we review the voluntariness of a confession, we must conduct "an independent examination of the totality of the circumstances to determine whether the statement is the product of an essentially free and unconstrained choice by [this particular defendant], or whether [his] will has been overborne and his capacity for self-determination critically impaired." Bailey v. Commonwealth, 20 Va. App. 236, 239, 456 S.E.2d 144, 145 (1995) (internal quotations and citations omitted).  There are two categories of factors to consider:  the defendant's characteristics and the police interrogation tactics.  Midkiff v. Commonwealth, 250 Va. 262, 268, 462 S.E.2d 112, 116 (1995). "The existence of any of the . . . factors does not necessitate a finding that the confession was involuntary."  Ronald J. Bacigal, Virginia Criminal Procedure § 7-2, 157 (4th ed. 1999)

-

(footnote omitted).  They are merely factors for the trial court to consider.  Id.

The defendant proffered that his IQ was 69 and he dropped out of school in the eleventh grade.  His intelligence and education are among several factors to be considered when determining whether a statement was voluntary.  Simpson v. Commonwealth, 227 Va. 557, 564, 318 S.E.2d 386, 390 (1984) (twenty-year-old defendant's IQ of 78, alone, did not render his confession involuntary).  "'[A] defendant's mental condition, by itself and apart from its relation to official coercion, should [never] dispose of the inquiry into constitutional "voluntariness."'"  Bottenfield, 25 Va. App. at 324, 487 S.E.2d at 888 (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)).  While there was evidence of the defendant's intellectual deficit, the record does not suggest that he failed to understand the circumstances that attended the statement.  Bottenfield, 25 Va. App. at 328, 487 S.E.2d at 889.

The defendant emphasizes the police ruse to get him to the police station.  While police misrepresentations are a factor to consider in determining whether the defendant exercised his own free will, those misrepresentations alone do not render his confession involuntary.  Swann v. Commonwealth, 247 Va. 222, 232, 441 S.E.2d 195, 202, cert. denied, 513 U.S. 889 (1994) ("a police officer's misrepresentation during interrogation will not invalidate a confession unless it causes a suspect to make a

-

confession he otherwise would have withheld").  Even an officer's lie to a defendant during interrogation, or the officer's fabrication of evidence, is not, in and of itself, sufficient.  Rodgers v. Commonwealth, 227 Va. 605, 616, 318 S.E.2d 298, 304 (1984); Smith v. Commonwealth, 219 Va. 455, 470, 248 S.E.2d 135, 144-45 (1978), cert. denied, 441 U.S. 967 (1979).  "Voluntariness is not to be equated with 'the absolute absence of intimidation.'"  Bacigal, supra, § 7-2 n.17 at 160 (quoting United States v. Wertz, 625 F.2d 1128, 1134 (4th Cir. 1980)).

Considering the totality of all the circumstances, the record indicates that the defendant's will was not overborne and his capacity for self-determination was not impaired.  "Coercive police activity is a necessary predicate to a finding that a confession is not 'voluntary' . . . ."  Connelly, 479 U.S. at 167.  The evidence supports the finding that the confession was voluntarily made.

Next, the defendant contends the trial court erred in excluding expert testimony about his mental retardation.  The defendant proffered the testimony of two mental health expert witnesses.  He argued the testimony would explain the factors to be taken into consideration when determining the reliability of a confession by someone with the defendant's level of mental retardation.  After hearing the testimony, the trial court

-

excluded the evidence ruling it would invade the province of the jury.

Dr. Bernice Marcopulos, a clinical psychologist, testified the defendant had an IQ of 69, which indicated he was mildly mentally retarded. The defendant functioned mentally in the bottom two percent of the population. He would have difficulty comprehending instructions and written or oral communications.

Next, Dr. Stephen Herrick, a forensic psychologist, testified. He felt the defendant was highly susceptible to negative feedback, functioned at an elementary school level, and concluded, "I think he just went along with what they said."

The expert testimony was an opinion that the defendant did not make the statements attributed to him by the police. During his own testimony, the defendant maintained that he never uttered the statements in his confession. He testified that he only uttered "okay whatever" in response to a narrative that the police fabricated and recited to him. The expert opinion went directly to whether the defendant's denial of making a confession was true. The opinion that the defendant just went along with the police narration was a comment on the defendant's credibility. It did not go to whether the confession, the incriminating words which the police said he spoke, was reliable.

An expert may not "express an opinion as to the veracity of any witness." Fitzgerald v. Commonwealth, 223 Va. 615, 630, 292

-

S.E.2d 798, 806 (1982), cert. denied, 459 U.S. 1228 (1983);

Coppola v. Commonwealth, 220 Va. 243, 252-53, 257 S.E.2d 797,

804 (1979), cert. denied, 444 U.S. 1103 (1980).  Such evidence

is a comment on an ultimate fact within the province of the jury

and must be excluded by the trial court.  Davison v.

Commonwealth, 18 Va. App. 496, 504, 445 S.E.2d 683, 688 (1994).

Whether the defendant made the statements attributed to him

was a fact the jury was able to assess without the need for

expert opinion.  "[W]here the facts and circumstances shown in

evidence are such that men of ordinary intelligence are capable

of comprehending them, forming an intelligent opinion about

them, and drawing their own conclusions," expert opinion

"founded upon such facts is inadmissible."  Schooler v.

Commonwealth, 14 Va. App. 418, 420, 417 S.E.2d 110, 111 (1992)

(quoting Venable v. Stockner, 200 Va. 900, 904, 108 S.E.2d 380,

383 (1959)).

Admission of expert testimony is committed to the sound

discretion of the trial judge.  Utz v. Commonwealth, 28 Va. App.

411, 423-24, 505 S.E.2d 380, 386 (1998).  A careful reading of

the proffered evidence supports the trial court's determination

that the testimony would invade the province of the jury.  We

cannot say the trial court abused its discretion in excluding

testimony that elicited an opinion of veracity.

The defendant argues that if the opinion was not admissible

during his case-in-chief, it became admissible after the

-

Commonwealth presented rebuttal evidence that the defendant checked books out of the jail library.  The defendant claims that evidence opened the door to the expert testimony about his mental state when making the confession.

The Commonwealth presented the evidence to rebut the defendant's conflicting testimony about his ability to read and write.  It did not directly address the defendant's mental retardation or the reliability of his confession.  We conclude that the trial court did not err in ruling that the Commonwealth did not open the door to the expert testimony.

For the foregoing reasons, we affirm the decisions of the trial court.

<u>Affirmed</u>.

Benton, J., dissenting.

                              I.

The evidence proved that the police lied to Pritchett in order to lure him to the police station for interrogation. First Sergeant Humphreys testified that even though the police had identified Pritchett as the person on the videotape using Singleton's ATM card, they did not confront him with that fact before he came to the police station.  Instead, they told Pritchett that a defendant, whom Pritchett had helped the Commonwealth convict for murder, was appealing her conviction. The officer who handled the earlier case told Pritchett that they needed to "reinterview him" for that appeal and asked Pritchett to come to the police station to give them additional assistance.  When Pritchett arrived, the police continued the ruse by discussing the case Pritchett earlier had assisted them in prosecuting.

First Sergeant Humphreys testified that the following then occurred:

> After [he and I] talked about [the ruse]
> case, I told him that a composite had been
> done that was disseminated . . . to all the
> police agencies and someone had said that he
> looked similar to the composite and also a
> white vehicle had been seen at the rest area
> and we needed to eliminate him because some
> people said, talked about the white vehicle
> and . . . said he looked like the composite
> and the best way to do that was through a
> polygraph . . . .

                              -

As Pritchett waited in a hallway for the polygraph examination, Agent McDowell read <u>Miranda</u> rights to him.  Pritchett signed a waiver form and took the polygraph examination.  At the conclusion of the examination, Agent McDowell told Pritchett he had failed the test.  As Agent McDowell questioned Pritchett, he heard Pritchett say "need an attorney."  He ceased questioning Pritchett and left the room.

First Sergeant Humphreys and Investigator Croy were watching behind a "two-way mirror."  First Sergeant Humphreys testified that Pritchett said "I think I might need an attorney."  Investigator Croy testified that someone told him Pritchett had made that statement.  Nevertheless, First Sergeant Humphreys and Investigator Croy entered the room to confront Pritchett.  First Sergeant Humphreys testified as follows:

> When he said I think I might need an attorney, Agent McDowell left the polygraph room.  Norman Croy and myself entered the polygraph room pushing a, a TV with a VCR recorder.  We pushed it into the polygraph room, inserted the ATM transaction video.  Didn't say anything, just played the tape for Mr. Pritchett.

> \*    \*    \*    \*    \*    \*    \*

> Once the video started playing, and, and a face came on the screen, he said, what's that, and I told him that was his, the side of his face.

First Sergeant Humphreys and Investigator Croy further interrogated Pritchett about the murder of Singleton.  They did not first tell Pritchett he was not under arrest and that he was

-

entitled to an attorney before responding.  This evidence proved Pritchett was interrogated in an atmosphere which was "police dominated" and "inquisitorial."

## II.

The failure of the police to give Miranda warnings prior to custodial interrogations and to honor the exercise of those rights requires suppression of evidence obtained as a result of the interrogation.  Miranda v. Arizona, 384 U.S. 436, 478-79 (1966).  The United States Supreme Court has recently underscored the constitutional nature of the Miranda warnings as a component of the general prohibition against the admission of involuntary confessions under the Fifth and Fourteenth Amendments.  Dickerson v. United States, 120 S. Ct. 2326, 2333 (2000).  The police must provide a suspect with the four Miranda warnings during any custodial interrogation for the confession to be admissible evidence.  Id. at 2331.  In this case, the police did not meet this requirement.

We determine whether a person is "in custody" for purposes of Miranda by examining the circumstances of each case.  "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest."  Ford v. Commonwealth, 28 Va. App. 249, 256, 503 S.E.2d 803, 806 (1998) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (citation omitted)).  In making this inquiry, we examine the circumstances from the perspective of "how a

-

reasonable [person] in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). "Thus, a suspect is 'in custody' when the objective circumstances would lead a reasonable person to believe he was under arrest, thereby subjecting him or her to pressure impairing the free exercise of the privilege against self-incrimination." Cherry v. Commonwealth, 14 Va. App. 135, 140, 415 S.E.2d 242, 245 (1992). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994).

> Among the factors that must be considered
> are whether a suspect is questioned in
> familiar or neutral surroundings, the number
> of police officers present, the degree of
> physical restraint, and the duration and
> character of the interrogation. Whether or
> when probable cause to arrest exists and
> when the suspect becomes the focus of the
> investigation are relevant facts to
> consider. "[T]he language used by the
> officer to summon the individual, the extent
> to which he or she is confronted with
> evidence of guilt, the physical surroundings
> of the interrogation, the duration of the
> detention and the degree of pressure applied
> to detain the individual" may be significant
> factors as well.

Wass v. Commonwealth, 5 Va. App. 27, 32-33, 359 S.E.2d 836, 839 (1987) (citations omitted).

The totality of the objective circumstances in this case would lead a reasonable person in Pritchett's position to

-

believe he was under arrest.  See Cherry, 14 Va. App. at 140, 415 S.E.2d at 245.  Pritchett was "subjected to restraints comparable to those associated with a formal arrest."  Berkemer, 468 U.S. at 441.  Three police officers interrogated Pritchett.  Moreover, the interrogation was not of a short duration but lasted approximately three and one-half hours.  See id. at 441 n.34 (citing Commonwealth v. Meyer, 412 A.2d 517, 518-19, 522 (Pa. 1980) (holding that a driver who was detained for over one-half hour was in custody for the purposes of Miranda by the time the driver was questioned concerning the circumstances of an accident)).  A reasonable person in Pritchett's position would clearly feel that he was unable to leave and that he was, in fact, "in custody."  I would hold, therefore, that Pritchett's interrogation was the "functional equivalent of formal arrest," Berkemer, 468 U.S. at 442, and created a custodial situation requiring appropriate Miranda warnings.

Once Pritchett "expressed his desire to deal with the police only through counsel, [he was] not subject to further interrogation by the authorities until counsel [was] made available to him."  Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).  As the Court noted in Edwards, "it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."  Edwards, 451 U.S. at 485.

-

> Edwards set forth a "bright-line rule" that
> all questioning must cease after an accused
> requests counsel.  In the absence of such a
> bright-line prohibition, the authorities
> through "badger[ing]" or "overreaching" --
> explicit or subtle, deliberate or
> unintentional -- might otherwise wear down
> the accused and persuade him to incriminate
> himself notwithstanding his earlier request
> for counsel's assistance.

Smith v. Illinois, 469 U.S. 91, 98 (1984) (citation omitted).

The fact that Pritchett responded to the "further police-initiated custodial interrogation" is insufficient to establish that he waived his Miranda rights.  See Edwards, 451 U.S. at 484.  Pritchett's response after the detective informed him of the polygraph results was to express his "need [for] an attorney."

Pritchett's statements constitute unequivocal, unambiguous requests for counsel.  In McDaniel v. Commonwealth, 30 Va. App. 602, 518 S.E.2d 851 (1999) (en banc), we considered whether a defendant had invoked his right to counsel by stating, "I think I would rather have an attorney here to speak for me."  Id. at 604, 518 S.E.2d at 852.  We held that this unambiguous statement was understandable to a reasonable police officer and that all interrogation should have ceased.  No substantive difference exists between McDaniel's "I think I would rather have an attorney here to speak for me," and Pritchett's "I think I might need an attorney."  Neither statement is a question.  See, e.g., Mueller v. Commonwealth, 244 Va. 386, 396-97, 422 S.E.2d 380,

-

387 (1992) (holding that, "Do you think I need an attorney here?" is not a request for counsel). The substitution of the word "might" for "would" confers no greater uncertainty on the request.

Edwards assumes a case in which a request for counsel is made and is initially honored by the police. "Edwards established a bright-line rule to safeguard pre-existing rights . . . ." Solem v. Stumes, 465 U.S. 638, 646 (1984). When the police cease interrogation following invocation of the right to counsel, they send an unmistakable signal to an accused that the rights contained in the Miranda warnings are real and will be honored. If that is done, an interrogation initiated by the accused takes place against the background of rights that are real and respected by the police.

In this case, the two officers flagrantly disregarded Pritchett's request for counsel despite Agent McDowell's previous advice to Pritchett that he had a right to have counsel present. By their conduct, these officers conveyed the unmistakable message that the Miranda rights are illusory and that Pritchett's invocation of those rights was meaningless. Thus, the present case involves not an omission on the part of officers to provide Miranda warnings, but an affirmative disregard of Pritchett's invocation of the right to counsel and a continuation of interrogation in contravention of his rights. The continued interrogation following Pritchett's expressed

-

desire to consult with an attorney unmistakably conveyed a message which could not be erased by another similar warning. The United States Supreme Court recognized this fact in <u>Arizona v. Roberson</u>, 486 U.S. 675 (1988), and ruled as follows:

> [T]o a suspect who has indicated his inability to cope with the pressures of custodial interrogation by requesting counsel, any further interrogation without counsel having been provided will surely exacerbate whatever compulsion to speak the suspect may be feeling. Thus, we also disagree with petitioner's contention that fresh sets of <u>Miranda</u> warnings will "reassure" a suspect who has been denied the counsel he has clearly requested that his rights have remained untrammeled.

<u>Id.</u> at 686.

I would hold that Pritchett unambiguously responded with sufficient clarity that a reasonable police officer would have understood that he wanted an attorney. Thus, the interrogation should have ceased. See <u>McDaniel</u>, 30 Va. App. at 607, 518 S.E.2d at 854; <u>Edwards</u>, 451 U.S. at 484-85. Because I believe that the detectives gained Pritchett's confession by continuing the interrogation after he had invoked his Fifth Amendment right to counsel, I would reverse the trial judge's denial of the suppression motion.

### III.

Not only did the trial judge fail to require that the prosecution follow the dictates of <u>Miranda</u>, he failed to ensure that Pritchett's confession was voluntary as required by general

-

notions of due process.  See Dickerson, 120 S. Ct. at 2330.  It

is fundamental "that a jury is not to hear a confession unless

and until the trial judge [or some other independent

decisionmaker] has determined that it was freely and voluntarily

given."  Sims v. Georgia, 385 U.S. 538, 543-44 (1967).  See

generally Jackson v. Denno, 378 U.S. 368 (1964).  In determining

voluntariness, the Court must ask the following:

> Is the confession the product of an
> essentially free and unconstrained choice by
> its maker?  If it is, if he has willed to
> confess, it may be used against him.  If it
> is not, if his will has been overborne and
> his capacity for self-determination
> critically impaired, the use of his
> confession offends due process.
>
> In determining whether a defendant's will
> was overborne in a particular case, the
> Court [must assess] the totality of all the
> surrounding circumstances -- both the
> characteristics of the accused and the
> details of the interrogation.

Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973) (internal

quotations and citation omitted).

The "totality of all the surrounding circumstances"

includes the defendant's background and experience, the conduct

of the police, and the details of the interrogation.  See

Midkiff v. Commonwealth, 250 Va. 262, 269, 462 S.E.2d 112, 116

(1995).  "If a suspect's statements had been obtained by

'techniques and methods offensive to due process,' or under

circumstances in which the suspect clearly had no opportunity to

exercise 'a free and unconstrained will,' the statements would

-

not be admitted." Oregon v. Elstad, 470 U.S. 298, 304 (1985). Whether a statement is voluntary is a legal rather than a factual question. See Midkiff, 250 Va. at 268-69, 462 S.E.2d at 116. Thus, we review de novo the trial judge's determination that Pritchett's statement was voluntary. See Harris v. Commonwealth, 27 Va. App. 554, 561, 500 S.E.2d 257, 260 (1998).

"The mental condition of the defendant is 'surely relevant to [his] susceptibility to police coercion.'" Commonwealth v. Peterson, 15 Va. App. 486, 488, 424 S.E.2d 722, 723 (1992) (quoting Colorado v. Connelly, 479 U.S. 157, 165 (1986)). Although evidence in the record of coercive police activity "is a necessary predicate to the finding that a confession is not 'voluntary,'" id., the coercion does not have to be physical to invalidate a confession.

> "[The Supreme] Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition. A number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion.'"

Jackson, 378 U.S. at 389-90 (citation omitted).

The evidence proved that Pritchett is mentally retarded with an IQ of 69. As a ruse to get Pritchett into the police station for interrogation, the police lied about their need to have Pritchett assist them on a case in which he had previously

-

assisted the police.  After Pritchett went to the police station in response to the ruse, the police then accused him of committing the murder.  During the interrogation, the police did not tell Pritchett he was free to leave.  Given Pritchett's level of cognitive functioning, no evidence established he acted voluntarily.

Agent McDowell gave <u>Miranda</u> warnings to Pritchett before administering the polygraph.  "Proof that some kind of warnings were given or that none were given [is] relevant evidence . . . of whether the questioning was in fact coercive."  <u>Beckwith v. United States</u>, 425 U.S. 341, 348 (1976).  However, when Pritchett completed the polygraph and said he needed a lawyer, the officers ignored his request and continued the interrogation.

The officers who deflected his request had been watching the polygraph examination and knew that Pritchett had made the request.  They entered the room and distracted him by showing the videotape to restart the interrogation.  When Pritchett's request for counsel was ignored, further interrogation reinforced the coerciveness of the police conduct.  With regard to determining whether police tactics were coercive, the Supreme Court has ruled as follows:

> [T]he Court's analysis has consistently been
> animated by the view that "ours is an
> accusatorial and not an inquisitorial
> system," <u>Rogers v. Richmond</u>, 365 U.S. 534,
> 541 (1961), and that, accordingly, tactics

-

> for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness. Indeed, even after holding that the Fifth Amendment privilege against compulsory self-incrimination applies in the context of custodial interrogations, <u>Miranda v. Arizona</u>, 384 U.S. 436, 478 (1966), and is binding on the States, <u>Malloy v. Hogan</u>, 378 U.S. 1, 6 (1964), the Court has continued to measure confessions against the requirements of due process. <u>See</u>, <u>e.g.</u>, <u>Mincey v. Arizona</u>, [437 U.S. 385, 402 (1978)]; <u>Beecher v. Alabama</u>, 389 U.S. 35, 38 (1967) (<u>per curiam</u>).

<u>Miller v. Fenton</u>, 474 U.S. 104, 109-10 (1985).

The totality of these circumstances, including Pritchett's IQ, the police tactics, and the failure to acknowledge Pritchett's request for counsel, establish that Pritchett's statement was not voluntarily given.

### IV.

The Commonwealth argued at trial that the testimony of Pritchett's experts was irrelevant because Pritchett did not plead not guilty by reason of insanity. I disagree. The Commonwealth's argument fails to recognize the significant differences between mental illness and mental retardation. Pritchett's counsel informed the trial judge as follows:

> [T]he intent of the experts . . . is to Number one, first of all, introduce for the jury's benefit the defendant's I.Q. and how that particular I.Q. was established, and . . . in addition to that, introduce for the jury's consideration evidence with respect to the reliability of a confession that is given by someone that is mentally retarded.

-

> I do not intend for this, for our experts to testify to the ultimate issue, as to whether or not . . . Pritchett in fact confessed to this particular crime, and whether or not it was a valid confession.

The record contains as a proffer extensive testimony by Dr. Bernice Marcopulos, a clinical neuropsychologist, and Dr. Stephen Herrick, a forensic psychologist, both of whom examined Pritchett. They testified that Pritchett is mentally retarded and explained the cognitive limitations that accompany mental retardation. In particular, Dr. Herrick testified that "there's a lot of misunderstandings about mental retardation, [it's] not just being slow." He further testified that Pritchett's cognitive deficiencies limited his language and communication skills and rendered him vulnerable to interrogative suggestibility. Both expert witnesses established a sufficient basis to render their testimony admissible to provide the jury an explanation of Pritchett's intellectual limitations. The trial judge's ruling, which barred the evidence, was based on the erroneous conclusion that the experts' testimony went to the ultimate issue of intent, rather than to the reliability of the confession, the purpose for which it was offered.

In barring Pritchett's expert testimony, the trial judge and the Commonwealth relied on Zelenak v. Commonwealth, 25 Va. App. 295, 487 S.E.2d 873 (1997) (en banc), and Stamper v. Commonwealth, 228 Va. 707, 324 S.E.2d 682 (1985). Both cases are inapposite. In Zelenak, we held that the proffered

-

testimony expressed an opinion on the ultimate issue of intent because Zelenak's psychologist would have testified that at the time of the crime Zelenak was suffering under a disorder which made her "susceptible to duress." See 25 Va. App. at 300, 487 S.E.2d at 875. In Stamper, the defendant sought to "introduce psychiatric testimony to prove that he was manic-depressive, in a manic state on the date of the offense, and consequently incapable of forming the intent to distribute, which is a requisite element of the crime [with which he was charged]." 228 Va. at 715-16, 324 S.E.2d at 687. The Supreme Court held that in the absence of an insanity defense, the trial court properly excluded the evidence of Stamper's mental state at the time of the offense because it was irrelevant to the issue of guilt. See id. at 717, 324 S.E.2d at 688.

Unlike Zelenak and Stamper, Pritchett did not seek to introduce expert testimony on the ultimate issue in the case or on his mental state at the time of the crime. He sought to introduce the evidence to influence the jury's view of his confession. In ruling that Pritchett's expert testimony was inadmissible, the trial judge said that Pritchett was "correct in maintaining that the issue of mental retardation is not within the range of common experience of most juries." Thus, even the trial judge agreed that the expert "testimony related to a matter of inquiry that was beyond the ordinary knowledge, intelligence, and experience of a jury." Breeden v. Roberts,

-

258 Va. 411, 415, 518 S.E.2d 834, 837 (1999). "It is well settled in Virginia that the opinion of an expert witness is admissible where the jury, or the court trying a case without a jury, is confronted with issues that cannot be determined intelligently merely from the deductions made and inferences drawn on the basis of ordinary knowledge, common sense, and practical experience gained in the ordinary affairs of life and thus require scientific or specialized knowledge." Schooler v. Commonwealth, 14 Va. App. 418, 420, 417 S.E.2d 110, 111 (1992) (internal quotations deleted).

"The manner in which a statement was extracted is, of course, relevant to the purely legal question of its voluntariness . . . ." Crane v. Kentucky, 476 U.S. 683, 688-89 (1986). Its relevance, however, is not limited to that question. Pritchett's entire defense was that there was no physical evidence to link him to the murder and that, because of his mental retardation, his earlier admission of guilt was not reliable. To support that defense, he sought to introduce evidence concerning the involuntariness of his confession.

> Confessions, even those that have been found
> to be voluntary, are not conclusive of
> guilt. And, as with any other part of the
> prosecutor's case, a confession may be shown
> to be "insufficiently corroborated or
> otherwise . . . unworthy of belief."
> Indeed, stripped of the power to describe to
> the jury the circumstances that prompted his
> confession, the defendant is effectively
> disabled from answering the one question
> every rational juror needs answered: If the

-

> defendant is innocent, why did he previously
> admit his guilt?  Accordingly, regardless of
> whether the defendant marshaled the same
> evidence earlier in support of an
> unsuccessful motion to suppress, and
> entirely independent of any question of
> voluntariness, a defendant's case may stand
> or fall on his ability to convince the jury
> that the manner in which the confession was
> obtained casts doubt on its credibility.

Id. at 689 (citation omitted).

Evidence of the circumstances that yielded the confession was all but indispensable to Pritchett's defense. "[E]vidence about the manner in which a confession was secured will often be germane to its probative weight . . . ."  Id. at 688; see also Connelly, 479 U.S. at 165 (stating that "mental condition is surely relevant to an individual's susceptibility to police coercion").  The trial judge's evidentiary ruling deprived Pritchett of his fundamental constitutional right to a fair opportunity to present a defense.  See California v. Trombetta, 467 U.S. 479, 485 (1984).

Pritchett did not deny that he was in possession of some of Singleton's property and that he attempted to use Singleton's ATM and Montgomery Ward cards.  He testified that he found in a grocery store parking lot those items and the other property belonging to Singleton.  He denies, however, that he killed Singleton.  Given the circumstantial nature of the Commonwealth's case against Pritchett and the fact that the police did not audio or videotape his confession, Pritchett's

-

expert evidence concerning his mental retardation was crucial to the jury's determination of the voluntariness and reliability of his confession as related by the police. "Expert testimony is appropriate to assist triers of fact in those areas where a person of normal intelligence and experience cannot make a competent decision." Swiney v. Overby, 237 Va. 231, 233, 377 S.E.2d 372, 374 (1989).

Without expert testimony explaining Pritchett's particular susceptibility to the investigative tactics because of his mental retardation, Pritchett was deprived of the opportunity to familiarize the jury with the circumstances concerning the taking of his confession, including "'facts bearing upon its weight and voluntariness.'" Crane, 476 U.S. at 688 (quoting Lego v. Twomey, 404 U.S. 477, 486 (1972)). He was entitled to prove that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." Miller, 474 U.S. at 109.

Moreover, the Commonwealth later opened the door to the expert testimony when it called a witness to testify concerning the materials Pritchett checked out from the jail library. Unrebutted, this testimony implied that Pritchett was not retarded and was more intelligent than he claimed. For the reasons explained above, I would rule that by barring the expert

-

testimony, the trial judge denied Pritchett the opportunity to present an adequate defense.

I dissent.