UPON REHEARING EN BANC
FITZPATRICK, Chief Judge.
This matter comes before the Court on a rehearing en banc from a divided panel opinion rendered November 23, 2004. In that opinion, a panel of this Court considered Janice Larue Orndorffs (appellant) appeal of the trial court’s decision to deny her motion for a new trial following her convictions for second-degree murder pursuant to Code § 18.2-32 and the use of a firearm in the commission of murder pursuant to Code § 18.2-53.1. Appellant contends evidence was discovered after the jury returned its verdict that established she suffered from Dissociative Identity Disorder (DID) (formerly known as multiple personality disorder or MPD), that such a disorder constitutes a legal defense to murder, and that she was, therefore, entitled to a new trial. The panel agreed and reversed the trial court’s denial of her motion for a new trial, vacated her convictions for second-degree murder and use of a firearm in the commission of murder, and remanded for a new trial.
By order dated December 28, 2004, we granted the Commonwealth’s petition for a rehearing en bane, stayed the mandate of the panel decision, and reinstated the appeal. Upon rehearing en banc, we affirm the trial court’s denial of appellant’s motion for a new trial and affirm her convictions.[1]
*826 In accord with familiar principles of appellate review, we will view the evidence, and all reasonable inferences flowing from the evidence, in a light most favorable to the Commonwealth as the prevailing party in the trial court. Banks v. Commonwealth, 41 Va.App. 539, 543, 586 S.E.2d 876, 877 (2003).
I. Background
The evidence established that, in early 2000, appellant and her husband were having severe marital problems. She believed that he was having an affair. She told her mother-in-law that she would “see him dead before he [left her] for another woman.” She then contacted Thomas George Underwood (Underwood), a lawyer, and requested him to represent her “if it came to divorce.” He declined to do so and offered to refer her to another lawyer. Underwood spoke to appellant again on March 20, 2000, the day of the murder, to inform her that the divorce lawyer he contacted could not see her for several days. Appellant “sounded fine” and said she was going to dinner with her husband for their anniversary. That same day, appellant’s husband told his mother that “things are worse, I’ve had all I can take, I’m leaving [appellant] tonight.”
After returning home from dinner, appellant shot and killed her husband. He was shot five times: once in the top of his head, three times in his torso, and once in his left palm. He was found dead on the kitchen floor with a baseball bat in his left hand and a knife in his right hand.
At 8:37 p.m., appellant called Underwood and told him that she shot her husband because he attacked her with a baseball bat and knife. Underwood advised her to call 911 immediately and request an ambulance. A few minutes later, appellant called 911 and told the operator that her husband attacked her *827 with a baseball bat and knife and that she had shot him. The 911 call was tape recorded and entered into evidence at trial.
During the phone call to 911, appellant’s actions fluctuated among periods of lucidity, hysteria, disorientation, and childishness. At times, she spoke calmly and slowly and called the operator by name. At other times, she seemed unable to discern to whom she was speaking. She requested to speak to her “mommy,” and at one point appeared to be speaking to her mother directly. She also cried hysterically and stated, “He is going to kill me.” When the operator asked her location in the house, appellant replied that she was unsure where she was. Later, she told the operator that she was in the study. The operator also asked her where her husband was located, and appellant replied that he was on the kitchen floor. Later, she claimed that she did not know where he was. The operator asked appellant whether she had called Underwood before she called 911.[2] Appellant denied making the call. At times, she failed to answer the operator’s questions.
While appellant was on the phone with the 911 operator, police officers gathered outside her house. First Sergeant Robert J. McHale (McHale) tried to coax appellant out of the house. She approached the front door and then returned to the residence. Eventually, appellant “bolted out of the residence.” McHale ran to meet her and led her to his police cruiser. McHale stated that appellant continuously yelled and screamed that her husband was trying to kill her as she came out of the house. McHale, after detecting a “strong odor of alcohol,” asked her whether she had been drinking. Appellant “very calmly” replied that she drank a “couple of glasses of wine” with dinner, but “then went back into he’s trying to kill me.” McHale said he found the sudden changes in appellant’s demeanor — from hysterical to calm and back to hysterical again — “kind of strange.” Other witnesses on the scene— including Underwood, Bo Longston, a paramedic, and appellant’s son, Kurt Bond — reported that appellant was “not mak *828 ing any sense” and exhibited signs of disorientation and hysteria.
Before trial, defense counsel gave notice that appellant intended to present psychiatric and psychological evidence to rebut the anticipated position of the Commonwealth that her behavior the night of the murder was an act designed to deceive the police. Defense counsel conceded that they were not raising a psychiatric defense. “We are not claiming ... that she did not understand right from wrong, nor are we contending that she suffered from an irresistible impulse.” The Commonwealth moved to exclude the proffered evidence.
At the pretrial hearing on the Commonwealth’s motion to exclude this testimony, mental health experts retained by defense counsel testified about appellant’s mental state. Dr. Susan Fiester and Dr. Wilfred van Gorp diagnosed appellant as suffering from mental disorders, including post-traumatic stress disorder (PTSD) and dissociative disorder not otherwise specified (DD NOS). Dr. Fiester testified that DD NOS is the diagnosis indicated when the patient’s symptoms meet “many of the criteria of one or the other specific dissociative disorders, but doesn’t fit it exactly.” Dr. Fiester and Dr. van Gorp based the diagnosis of DD NOS, in part, on appellant’s inability to remember the events surrounding her husband’s death, on her behavior during the 911 call, on transcripts of her interviews with police, on a review of her prior history revealing that she had experienced a dissociative event after a car accident, and on lengthy personal interviews.
Neither Dr. Fiester nor Dr. van Gorp opined that appellant suffered from DID or any other mental disorder that would be a legal defense to the charged offenses. Dr. Fiester stated that she found no basis to conclude that appellant “was legally insane at the time of the offense.” There was no evidence that she did not “know the difference between right and wrong” nor was she impelled to act by an “irresistible impulse.” The trial court granted the Commonwealth’s motion to exclude in part. The trial court allowed appellant’s experts to explain, in general terms, the nature of dissociative amne *829 sia, but they were not allowed to testify specifically about appellant’s diagnosis.
At trial, the Commonwealth argued to the jury that appellant’s post-shooting demeanor was a ruse designed “to conceal her guilt” and that appellant planted the baseball bat and knife after her husband had died. The Commonwealth buttressed their contention that appellant planted the baseball bat and knife with the testimony of Dr. Carolyn Revercomb, the medical examiner who conducted the autopsy on appellant’s husband, and First Sergeant Robert C. Zinn, a blood stain analysis expert.
Dr. Revercomb testified that the gunshot wound to the top of the husband’s head would have caused “[immediate unconsciousness” and that it was not “likely that one would be able to hold onto any items such as bat or knife, having sustained such a wound.” She further testified that the gunshot wound to the husband’s left hand was “consistent with someone putting their hand out in [a defensive] posture” and that it was “very unlikely” that he “could hold a baseball bat with [his] hand in such a position.” Furthermore, she opined that the gunshot wound to the left side of the husband’s torso was consistent with his “being on the ground when it was inflicted.”
Sergeant Zinn testified that, based on his examination and analysis of the medical examiner’s autopsy report and photographs, police photographs of the crime scene, the husband’s clothing, and the baseball bat, the husband could not have been holding the bat at the time he was shot.[3]
*830 Dr. William Brownlee, an expert in the field of forensic medicine, testified for appellant and countered the Commonwealth’s theory that she doctored the crime scene. Dr. Brownlee opined that, because the bat held by the husband was small, it could have been “easily gripped in the fingers” despite the bullet wound to the palm of his hand. Moreover, Dr. Brownlee testified that it was physiologically possible for the husband to continue holding the bat after the gunshot to the head.
Defense counsel argued that appellant shot her husband “because she was afraid ... he was going to hurt her” and that her unusual demeanor and behavior after the shooting was not an attempt to conceal her guilt but rather occurred because she suffered from PTSD and was dissociating as a result of the trauma she had just experienced. Appellant did not pursue an insanity defense.
The jury found her guilty of second-degree murder and use of a firearm during the commission of murder.
Shortly after the jury read its verdict in the guilt phase of the trial, appellant engaged in unusual behavior at the jail. She apparently told jail personnel that she was only twelve years old and did not belong in the “strict school” because she had done nothing wrong. Her actions instigated further mental health evaluations.
After examining her, Dr. Fiester informed the court that appellant was unaware that she was an adult or where she was. “Her understanding of the situation,” Dr. Fiester testified, “was that she’s in dire fear because she’s a child and she’s done something wrong and she has no idea what it is and why she’s where she is.” When asked whether appellant’s condition could “raise the spectrum of other psychiatric illnesses” besides a dissociative episode, Dr. Fiester replied that it could, explaining:
*831 It could raise the question of whether she might have problems with her reality testing; whether there is a psychotic part of the picture; whether there is what’s called a dissociative identity disorder, which is what used to be known in the past as a multiple personality disorder; or some other type of a dissociative disorder.
Dr. Fiester opined that appellant had a “severe mental illness” that rendered her incompetent to assist counsel in her defense.
Immediately upon learning of appellant’s behavior at the jail, Dr. van Gorp wrote in a letter to defense counsel as follows:
This abrupt change in [appellant’s] mental status is a very serious matter. It is my firm opinion that this decline and abrupt change in her mental state represents a state of regression and dissociation, producing a fugue-like state in which she has regressed to the identity she had as a child. At the very least, this represents dramatic regression in a person who has seriously dissociated: that is, in lay terms, she has become overwhelmed by the stress of her circumstances, and cannot consciously process what has happened to her. As a response, she has “split off’ from her conscious experience, and regressed to a child-like state, now believing she is in school in Union City, Tennessee, where she apparently grew up. This altered identity also raises the possibility of an even more serious condition, in which dissociation is more pervasive, and a multiple personality disorder must be seriously considered and psychologically and psychiatrically ruled out.
Based on these evaluations, the trial court ruled that appellant was not competent at that time to be sentenced and ordered her committed to Central State Hospital for a mental health evaluation pursuant to Code §§ 19.2-169.1 and 19.2-176.[4]
*832 Appellant remained at Central State Hospital for eight months. Dr. Greg Wolber, chief of the forensic evaluation team at Central State Hospital, and Dr. Daniel Sheneman, a member of the evaluation team, diagnosed ■ her as having PTSD and bipolar disorder. Some members of the treatment team thought she was malingering and questioned whether she was really dissociating at all. They opined that “a lot of her behavior was strictly manipulative and controlling ... and did not give credence to a true dissociative identity.”
While appellant was at Central State, Dr. Wolber consulted on his own initiative Dr. Paul Frederick Dell, a clinical psychologist and an authority on dissociative disorders. Dr. Dell diagnosed appellant with DID. After consulting with Dr. Dell, Dr. Fiester and Dr. van Gorp revised their diagnosis and concurred that appellant suffered from DID. After consideration of all the evaluations, the trial court certified pursuant to Code §§ 19.2-169.1 and 19.2-176 that appellant was competent to be sentenced.
As a result of the new diagnosis of DID offered by Dr. Dell, Dr. Fiester, and Dr. van Gorp, defense counsel filed a motion for a new trial prior to the commencement of the sentencing phase. Defense counsel asked that the judge defer his ruling on the motion until evidence of the new diagnosis was presented to the jury during the sentencing phase as mitigating evidence. Defense counsel noted that the same evidence presented in mitigation would be used to support the motion for a new trial. The trial judge agreed to the defense request and postponed his ruling until the trial was completed.
At sentencing, the jury received psychological as well as extensive factual information about appellant’s new diagnosis. *833 Appellant’s experts testified that the appropriate diagnosis for her mental state was DID. Dr. Dell based his diagnosis, in part, on his observation of classic DID symptoms, including the presence of alter personality states, unexplained periods of amnesia, and episodes of deafness. Regarding alter personality states, Dr. Dell stated he had “a very clear cut encounter with three different alter personalities”: “Jacob,” a strong, forceful male identified as the “protector” personality; “Jean Bugineau,” a French speaking personality; and “Janice Nanney,” a twelve-year-old child. Dr. Dell noted that appellant’s “switches into a child state” were shown in the 911 call he had reviewed earlier. Dr. Dell also noted that, “in most any sphere of the records that you look,” examples of appellant’s amnesia could be found. The same could be said of examples of appellant’s deafness, which Dr. Dell described as a “not uncommon dissociative sematic symptom! ].” Moreover, based on his examinations of appellant, the results of his own testing, and the results of certain tests given to appellant by Dr. van Gorp, Dr. Dell did not believe appellant was malingering or faking her symptoms.
In summarizing why appellant had not been diagnosed with DID before trial, Dr. Dell cited the other experts’ “profound lack of education and failure to ask questions and inability to recognize diagnostic signs.” He noted that reaching a correct diagnosis of DID is partly “a function of whether ... the clinician [ ] has the eyes to see” the alter personalities.
After consultation with Dr. Dell, Dr. Fiester and Dr. van Gorp revised their diagnosis and determined that appellant met the diagnostic criteria for DID delineated in the Diagnostic and Statistical Manual for Mental Disorders (4th ed. 1994) (DSM-IV). According to Dr. van Gorp, the four diagnostic criteria of DID are:
(A) the presence of two or more distinct identities or personality [states], each with its own relatively enduring pattern of perceiving!,] relating to and thinking about the environment [and] self; (B) at least two of these identities or personality states recurrently take control of the person’s behavior; (C) inability to recall important personal informa *834 tion that is too extensive to be explained by ordinary forgetfulness; and ([D]) the disturbance is not due to the direct physiological effects of a substance, for example, blackouts or chaotic behavior during alcohol intoxication, or a general medical condition, for example, complex seizures.
Dr. van Gorp stated he first considered the possibility of appellant having DID only when he “heard more episodes of the child persona coming forth” after her conviction. He noted that DID is “a very uncommon condition” and “is not a disorder that most clinical psychologists or psychiatrists encounter that often and so ... the psychologist or psychiatrist often tends to know what category the person falls into, such as dissociation, but unless what are called alters, these various personalities, emerge, the diagnosis can’t be reached.” He minimized the importance of appellant’s apparent personality switches during the 911 call, stating that evidence of DID was not “manifested in the 911 tape except [for appellant’s] calling the operator ‘mommy,’ ” which, in retrospect, he considered “sort of a harbinger” or “a little tip of the iceberg” of “what later appeared to be the child personality of a twelve-year-old.” Dr. van Gorp also stated that, based on the results of testing designed to detect malingering, appellant was not feigning her psychiatric symptoms of DID. Dr. Fiester’s conclusions mirrored those of Dr. van Gorp and Dr. Dell.
Dr. Richard Joseph Loewenstein, a psychiatrist and authority in the fields of trauma disorders and dissociative disorders retained by defense counsel, also evaluated appellant and diagnosed her with DID. He examined appellant on March 3, 2002 and encountered three distinct personalities: the “Janice persona,” which was the “usual baseline state”; a “childlike” alter personality; and an aggressive, self-proclaimed “protector” alter personality that “refused to give its name.” Dr. Loewenstein ruled out any malingering by appellant despite his usual “high index of suspicion ... especially in a forensic context.”
Dr. Loewenstein confirmed that DID “is a disorder that ... appear[s] to begin in childhood” and that most people with DID “report a history of significant childhood trauma.” Ap *835 pellant “reported a history with her own mother of significant physical punishment, whippings with a switch, being locked for long periods of time in a room where she was not allowed out.”[5] Dr. Loewenstein also testified that appellant’s sons, in discussing their mother’s “prior history,” reported “a large number of symptoms” on the part of their mother that were consistent with DID, including “chronic forgetfulness,” “being found by her children in a kind of trance state,” and being “very changeable in her behavior, at times being a very meek, church-going person ... and other times swearing like a sailor.”
Based on his evaluation of appellant, Dr. Loewenstein stated that it was his opinion that, “at the time of the murder,” appellant was “overwhelmed by symptoms of’ DID and that, therefore, “her mental state at the time of the act should lead to a finding of legal insanity by Virginia law under the ‘irresistible impulse’ test of the insanity statutes.”
After defense counsel presented the testimony of Dr. Dell, Dr. Loewenstein, Dr. Fiester, and Dr. van Gorp to the jury as outlined above, the Commonwealth called Dr. Daniel Sheneman, “the attending psychiatrist for the behavioral unit” at Central State Hospital and a member of appellant’s “treating team” at that facility, as a rebuttal witness. He stated that, “other than the Janice Orndorff [he] knew as an adult,” appellant “presented herself’ only “as a twelve-year-old[,] Janice Nanney,” during her stay at the hospital. She did so “about eight times.” Dr. Sheneman further testified, however, that appellant did “not meet the criteria” for DID and that her symptoms could “all be explained by ... other diagnoses” and were “related to her personality style.”
Explaining why appellant did not “meet the ... criteria for [DID] as outlined in the DSM-TV,” Dr. Sheneman said, among other things, that “[t]he only alter ... was the twelve-year-old and according to the diagnostic criteria, you have to have more *836 than one, which we did not observe.” On cross-examination, Dr. Sheneman conceded that he incorrectly stated that the diagnostic criteria in the DSM-IV requires the presence of “more than one” alter personality. However, he was not convinced that appellant’s presentation as a twelve year old qualified as a “personality state” or “distinct identity.” He also did not believe that appellant’s “inability to recall important personal information” was “too extensive to be explained by ordinary forgetfulness” as required by the DSM-IV criteria. Dr. Sheneman further stated that the incident of child abuse appellant informed him about — where appellant’s mother “placed [her] in a closet when she was child and there was a rat in the closet” — did not “qualif[y] as the type of [very severe sexual or physical] abuse you would see in most people with DID.” Furthermore, Dr. Sheneman said that the DSM-IV “specifically states ... that you have to be careful about diagnosing [DID] in patients that have forensic [criminal] issues that may use it for secondary gain.”[6] Based on all the factors contained in the DSM-IV and their observations of appellant’s behavior, Dr. Sheneman and “the other members of the treatment team[ ] did not feel that [appellant] met the criteria for that diagnosis” of DID.
The court also heard from Angela Valentine (Valentine), who was appellant’s cellmate both before she was sent to Central State Hospital and after she returned. Valentine testified that appellant told her “she could act like she was twelve years old when she got good and ready ... so she could, you know, beat the doctors at Central State.”
After considering all the evidence, the jury sentenced appellant to thirty-two years in prison for the murder of her husband, a sentence far in excess of the statutory minimum. The jury also sentenced her to three years in prison for using a firearm in the commission of murder.
*837 The trial judge also denied appellant’s motion for a new trial. In reaching that decision, the trial judge found that, while appellant showed the purported after-discovered evidence was not merely cumulative, corroborative or collateral, she failed to show that she could not have obtained that evidence, which was in her control, for use at trial through reasonable due diligence. The trial judge also found that appellant failed to show that the purported after-discovered evidence should produce the opposite result in another trial, stating as follows:
In part, I conclude that [such evidence] would not produce opposite results on the merits at another trial because the jury did, in fact, hear all this. They heard ... [,] in essence, her entire position, that she had DID, that there were multiple personalities, in fact, ... another personality is the one that committed the murder____
The trial judge sentenced appellant, in accord with the jury’s verdict, to a total sentence of thirty-five years.
II. The Trial Court Did Not Err in Denying Appellant’s Motion for a New Trial
The law governing review of motions for new trials is well settled.
“[M]otions for new trials based on after-discovered evidence are addressed to the sound discretion of the trial judge, are not looked upon with favor, are considered with special care and caution, and are awarded with great reluctance.” A party who seeks a new trial based upon after-discovered evidence “bears the burden to establish that the evidence (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable due diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial.”
Commonwealth v. Tweed, 264 Va. 524, 528-29, 570 S.E.2d 797, 800 (2002) (quoting Stockton v. Commonwealth, 227 Va. 124, *838 149, 314 S.E.2d 371, 387 (1984); Odum v. Commonwealth, 225 Va. 123, 130, 301 S.E.2d 145, 149 (1983)).
Appellant contends the trial court abused its discretion in denying her motion for a new trial. Specifically, appellant argues that the trial court incorrectly concluded: (1) that she could have secured evidence before trial that she suffered from DID through the exercise of reasonable due diligence, and (2) that the new DID diagnosis would not produce a different result upon retrial. We find no error in the trial court’s ruling.
A. The Trial Court Did Not Err in Finding Appellant Failed to Exercise Reasonable Due Diligence
The record in this case supports the trial court’s finding that evidence of appellant’s DID was discernible and available at the time of trial through the exercise of reasonable due diligence. Although appellant was unable to obtain an expert who diagnosed the specific type of dissociative disorder until later in the case, this does not mean that the evidence was unavailable at the time of trial. In effect, appellant asks us to allow a different post-trial diagnosis of a preexisting mental illness to require a new trial. This is a continuum that the law does not encourage.
The record is replete with examples of, and information about, appellant’s dissociative conduct and the possibility that the purported correct diagnosis of DID could have been made before trial. At the pretrial hearing, appellant presented two mental health experts who gave detailed opinions concerning her mental health at the time of the shooting and thereafter.[7] First, Dr. Fiester testified that, based on her interviews with appellant, which lasted over sixteen hours, her review of appellant’s records, and the 911 call, appellant met “many of the criteria of one or the other specific dissociative disorders.” Dr. Fiester discussed several of appellant’s dissociative events, including the dissociation and amnesia she experienced after *839 an automobile accident and the dissociative behavior evident during the 911 call. Based in part on appellant’s significant amnesia regarding the events surrounding her husband’s death, Dr. Fiester concluded that appellant “was in a dissociative episode for a period of time subsequent to her husband’s death.” Dr. Fiester specifically noted that “[o]ne can experience amnesia as a part of a dissociative disorder, sometimes referred to as multiple personality disorder.” (Emphasis added).
Dr. van Gorp reported that, during his examination of appellant before trial, he witnessed “an episode of dissociation by [appellant] right in my office that very day when I interviewed her.” Describing the incident of dissociation, Dr. van Gorp said that, when he asked appellant to describe instances where someone tried to hurt her, she repeatedly said “I don’t hear the question” and covered her ears with her hands. After a few moments, appellant “lowered her hands and she said, ‘Did you ask me something.’ ” Dr. van Gorp classified the incident as a “classic episode of dissociation.” Dr. van Gorp also found the 911 phone call to be “very poignant and glaring” because “addressing the 911 operator as ‘mommy’ would be a classic dissociation.” Although Dr. van Gorp did not state that the 911 call conclusively evidenced an alter personality, he stated that it was a “harbinger” and “a little tip of the iceberg” of the twelve year old alter. He stated that the alter did not clearly manifest itself in the tape “except [when appellant] call[ed] the operator ‘mommy.’” (Emphasis added).
Testifying at sentencing, Dr. Dell and Dr. Loewenstein reported that appellant presented symptoms of DID before trial. Dr. Dell explained that the “911 tape was a very clear example of dissociative confusion, of switches into a child state [,]” because “[t]here were times during the phone call where she was talking with the 911 operator where she was calling for mommy, quote, unquote.” (Emphasis added). He also stated that “instances of dissociation, amnesia, switches to other personalities,” and deafness were “to be found in most any sphere of the records that you look.”
*840 Dr. Loewenstein also stated that it was likely that appellant’s DID manifested itself before trial. Interviews with appellant’s sons confirmed his suspicion that she experienced symptoms of the disorder in the past. Appellant’s sons
purported a large number of symptoms that would be, actually, quite consistent with the dissociative [identity] disorder[,] including chronic forgetfulness to the point of forgetting a couple of times a week that she was cooking food at home and being found by her children in a kind of trance state and not remembering that she had started cooking food.
The sons reported further that her behavior changed unexpectedly; “at times [she was] a very meek, church-going person ... and at other times swearing like a sailor.” Her sons also said that she acted in child-like fashion at times, particularly around her daughters. None of this was “new” evidence but clearly existed prior to trial.
Additionally, all of the experts opined that DID is an illness that develops over a long period of time and has its etiology in childhood. Dr. Dell, in describing the failure of the other experts to properly diagnose appellant’s true condition, listed a “profound lack of education and inability to recognize diagnostic signs” as the basis for any possible earlier misdiagnosis. He testified that it was clear from the transcript of the 911 call that appellant’s “alters” were present at that time. Similarly, Dr. van Gorp found the 911 call to be a clear harbinger of appellant’s illness and cited a lack of education and training as the main barrier to diagnosing appellant’s DID.
Thus, even though appellant’s symptoms became more pronounced and easier to categorize after her conviction, that fact does not mean that appellant’s illness could not have been discovered through the exercise of reasonable due diligence and does not require that we reach a result different from that of the trial court. The testimony from the doctors provides clear evidence that, if appellant does indeed suffer from DID, she exhibited the clinical symptoms of that disease (albeit in varied forms) necessary for a correct diagnosis before trial. *841 Such symptoms either were present and unrecognized by appellant’s experts as significant or could have been discovered by asking the right questions or interviewing the right people. In any event, the diagnosis of DID was really just a different diagnosis of a known condition. We decline to hold that affixing a new label to a known set of behavioral patterns constitutes newly discovered “evidence.” To hold otherwise would leave the door open for a new trial with each new diagnosis and, thus, dispense with the finality that a trial on the merits requires.
While we have not earlier addressed this specific issue, two of our sister states have reached the same conclusion. In State v. Fosnow, 240 Wis.2d 699, 624 N.W.2d 883 (Wis.Ct.App. 2000), a prison psychiatrist diagnosed the defendant with DID after his conviction on several felonies. When he received the diagnosis, the defendant filed a motion to withdraw his pleas of no contest because the new diagnosis would show he was not criminally responsible for his acts. Id. at 885. He argued that the new diagnosis constituted newly discovered evidence that entitled him to withdraw his earlier no contest plea. Id. However, The Court of Appeals of Wisconsin noted that, as in the instant case, extensive psychiatric information about the defendant was available at the time of the plea and indicated dissociative personality features and other possible DID symptoms. Id. at 888. In other words, the main factors underlying the new diagnosis existed and were available at the time of defendant’s initial mental examinations. Accordingly, the court held that the new diagnosis was merely the new appreciation of the importance of existing evidence. Id. at 887, 888. Because “[njewly discovered evidence ... does not include ‘the new appreciation of the importance of evidence previously known but not used,’ ” id. at 886 (quoting State v. Bembenek, 140 Wis.2d 248, 409 N.W.2d 432, 435 (Wis.Ct.App.1987)), the court denied defendant’s motion for a new trial. See also People v. McSwain, 259 Mich.App. 654, 676 N.W.2d 236, 253 (2003) (“Failure to recognize a reasonably discoverable mental illness is not enough to require a grant of postjudgment relief.”); State v. Williams, 246 Wis.2d 722, 631 N.W.2d 623, *842 627 (Wis.Ct.App.2001) (noting that an expert’s assessment of preexisting information represents a “new appreciation of the importance of evidence previously known but not used,” not newly discovered evidence), overruled on other grounds by State v. Morford, 268 Wis.2d 300, 674 N.W.2d 349, 362 (Wis. 2004).
In Sellers v. State, 889 P.2d 895 (Okla.Crim.App.1995), the appellant was convicted of three counts of murder. Id. at 896. In an application for post-conviction relief, appellant argued that he was diagnosed after conviction with Multiple Personality Disorder (MPD) and that this newly discovered evidence required a new trial. Id. at 897. The court held that, “[t]hough at that time MPD was perhaps a relatively new mental disease, this fact does not provide a sufficient explanation ... for defense counsel’s failure to explore it” before trial because it was a recognized diagnosis at the time of trial. Id. “Trial counsel could have, with due diligence, discovered evidence of [appellant’s] ... MPD prior to trial. Accordingly it was not ‘newly discovered’ and would not warrant a new trial.” Id. at 897 n. 11.
Guided by the holdings in Fosnow and Sellers, the high standard of scrutiny to be applied to motions for a new trial based on after-discovered evidence, the broad discretion afforded the trial judge, and the facts of this case viewed in the light most favorable to the Commonwealth, we hold that the record here clearly supports the trial court’s determination that a diagnosis of DID could have been made before trial with the exercise of reasonable due diligence. Because the record supports the trial court’s ruling, we will not disturb it on appeal.
B. The Trial Court Did Not Err in Finding Appellant Failed to Demonstrate the Materiality of the DID Diagnosis
We also agree with the trial court that appellant failed to show the new diagnosis of DID would have produced an opposite result at a new trial because the jury heard the evidence during the sentencing phase and rejected it.
*843 Pursuant to the law governing motions for a new trial, appellant must demonstrate that the evidence in question is “material, and such as should produce opposite results on the merits at another trial.” Odum, 225 Va. at 130, 301 S.E.2d at 149. It is not enough that the evidence in question might produce a different result. Rather, “[bjefore setting aside a verdict, the trial court must have evidence before it to show in a clear and convincing manner ‘as to leave no room for doubt’ that the after-discovered evidence, if true[,j would produce a different result at another trial.” Carter v. Commonwealth, 10 Va.App. 507, 513, 393 S.E.2d 639, 642 (1990) (quoting Powell v. Commonwealth, 133 Va. 741, 756, 112 S.E. 657, 661 (1922)).
The unique procedural posture of this case shows that appellant failed to carry her burden. When defense counsel filed a motion requesting a new trial based on appellant’s new diagnosis, he asked the trial court to defer ruling on the motion until after the jury could consider the information and recommended a sentence. The evidence presented to the jury, as outlined above, was extensive. Several psychologists and psychiatrists described in great detail the nature of DID, appellant’s background, why her diagnosis was not made earlier, and that one of her “alters” was responsible for the murder of her husband. Appellant’s doctors opined that appellant was not feigning her illness. Dr. Sheneman, on the other hand, testified he thought appellant’s behavior could be motivated by “secondary gain” and that appellant did not meet the criteria for DID. Angela Valentine, appellant’s cellmate, testified that appellant stated she could manipulate her behavior at will. Thus, evidence for and against the DID diagnosis, which was simply a new label affixed to earlier known behavior patterns, was presented to the jury during the sentencing phase of the trial, and they found it unconvincing even as possible mitigation of punishment. In short, the jury discounted the new diagnosis of DID and sentenced her to far in excess of the minimum sentence for the offense. Therefore, the jury resolved the question of whether the additional evidence would produce a different result at a new trial.
*844 We acknowledge that the “materiality” prong of the after-discovered evidence test asks whether the new evidence would produce a different verdict “at another trial.” The test is framed in this manner because it is designed around the normal course, of events and presumes that no jury has weighed or considered the proffered after-discovered evidence. However, the procedural course of this case, as dictated by the appellant’s request to allow the evidence in the same trial, precludes the argument that the evidence should be heard by another jury in another trial. Appellant requested this procedure and should not now be heard to challenge it. Additionally, the materiality requirement assumes that the newly discovered evidence, is, in fact, discovered after trial and is unavailable for the initial fact finder to consider. We agree with the trial judge who succinctly stated that appellant failed to prove that the new evidence would produce a different verdict at another trial because the jury heard all of the evidence underlying her claim and discounted it. A new trial presenting the same evidence to a new jury would not produce a different result. See Odum, 225 Va. at 130, 301 S.E.2d at 149.
III. The Trial Court Did Not Err in Ruling that Appellant’s Experts Could Not Testify that Her Mental Illnesses Was the Basis for Inconsistencies in Her Behavior
Appellant next contends the trial court erred by failing to allow her experts to testify that her mental illness was a basis for several inconsistencies in her behavior, including the 911 call made on the night of the murder. We disagree.
“The admission of expert testimony is committed to the sound discretion of the trial judge, and we will reverse a trial court’s decision only where that court has abused its discretion.” Brown v. Corbin, 244 Va. 528, 531, 423 S.E.2d 176, 178 (1992). “It is well settled that an expert may not express an opinion as to the veracity of any witness.” Davison v. Commonwealth, 18 Va.App. 496, 504, 445 S.E.2d 683, 688 (1994) (internal quotations omitted). “An expert witness may not express an opinion as to the veracity of a witness *845 because such testimony improperly invades the province of the jury to determine the reliability of the witness.” Pritchett v. Commonwealth, 263 Va. 182, 187, 557 S.E.2d 205, 208 (2002).
The appellant proffered that her experts would give an explanation other than “intentional fabrication” for several of her actions subsequent to her husband’s death. In effect, as the trial court found, appellant wished to put on expert testimony “that she [was] in a dissociative state and that she’s suffering from amnesia and it is not because she’s lying.” Although the trial court allowed the experts to testify as to the general effect of trauma and that some lay observers might consider a dissociative act to be faking, he would not allow expert testimony which would comment on the credibility of the appellant’s statements. See id. (“[A]n expert may testify to a witness’s or defendant’s mental disorder and the hypothetical effect of that disorder on a person in the witness’s or defendant’s situation, so long as the expert does not opine on the truth of the statement at issue.”). This ruling was consistent with law and preserved the issue of the credibility of appellant’s statements for the jury. We find no error in the trial court’s ruling.
IV. The Trial Court Did Not Err in Finding Appellant Competent for Sentencing
Lastly, appellant contends that the trial court erred in sentencing her because she was incompetent. We disagree.
The party alleging incompetency has the burden to prove it by a preponderance of the evidence. See Code § 19.2-169(E). The United States Supreme Court has held that “the standard for competency to stand trial is whether the defendant has ‘sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding’ and has ‘a rational as well as factual understanding of the proceedings against him.’ ” Godinez v. Moran, 509 U.S. 389, 396, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321 (1993) (quoting Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960)). The trial court’s competency finding is a *846 question of fact and is reviewed under a plainly wrong standard. See Delp v. Commonwealth, 172 Va. 564, 570-71, 200 S.E. 594, 596 (1939); see also Naulty v. Commonwealth, 2 Va.App. 523, 524, 346 S.E.2d 540, 542 (1986). The evidence, viewed in a light most favorable to the Commonwealth, establishes that appellant was competent to be sentenced.
Appellant was sent to Central State Hospital for a post-trial evaluation pursuant to Code §§ 19.2-169.1 and 19.2-176. Dr. Wolber and the Central State treatment team submitted a report stating that appellant was competent to be sentenced. Two of the doctors involved in the report were called by defense counsel and questioned at length. The doctors pointed out that the dissociative episodes appellant demonstrated were generally quite brief, lasting from just five to six minutes. They also stated that appellant could be easily refocused and that she could avoid dissociative episodes by not putting her head down. The doctors also opined that a “lot of her behavior was strictly manipulative and controlling” and that there was a volitional component to her dissociative episodes. Although appellant’s experts put on evidence supporting a different conclusion, the trial court was free to accept or reject their opinions in whole or in part. Miller v. Cox, 44 Va.App. 674, 680, 607 S.E.2d 126, 129 (2005). Credible evidence supports the trial court’s finding of competency, and we will not disturb it on appeal.
V. Conclusion
We hold that the trial court did not abuse its discretion in denying appellant’s motion for a new trial because she failed to show that the new diagnosis of DID could not have been made through the exercise of reasonable due diligence and because she failed to show that the new diagnosis would have resulted in a different verdict. We further hold that the trial court did not err in prohibiting appellant’s experts from testifying regarding the veracity of her statements and in finding appellant competent for sentencing. Accordingly, we *847 affirm appellant’s convictions for second-degree murder and use of a firearm in the commission of murder.

Affirmed.

. Appellant contends we lack jurisdiction to hear the case en banc because we failed to order the en banc rehearing within twenty days of the panel decision as required by Rule 5A:34. We disagree. Rule 5A:34 provides that "[a] rehearing en banc on motion of the Court of Appeals *826 shall be ordered no later than 20 days after the date of rendition of the order to be reheard.” By its plain terms, Rule 5A:34 applies only when a rehearing en banc is scheduled by the Court on its own motion. Here, the Court did not order a rehearing en banc on its own motion; rather, the Commonwealth petitioned for the rehearing. Thus, the time limit prescribed by Rule 5A:34 does not apply.

. Underwood also called 911 to ensure an ambulance was sent to appellant’s residence.

. Other evidence presented to the jury included the testimony of appellant’s mother-in-law, appellant's son Kurt Bond, and appellant's friend Maura Jill Workman (Workman). Appellant's mother-in-law said that appellant told her she would rather see the husband "dead before he [left appellant] for another woman.” When told by her mother-in-law not to "talk like that,” appellant replied, "I can’t help it, he’s my whole life and that’s what I live for.” Kurt Bond said that, although his stepfather would get angry about “trivial things” and threaten to hit him, he was never hit by him and he never saw him hit appellant. Workman said that appellant offered her $10,000 to testify that she had seen appellant’s husband physically abuse appellant. Workman stated *830 that she had never seen such abuse and that she rejected appellant's offer.

. Code § 19.2-169.1 authorizes the trial court, at any time "before the end of trial,” to commit the defendant for a competency evaluation if *832 "there is probable cause to believe that the defendant ... lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense.” The trial court is directed to determine the defendant’s competency after receiving a competency report from the evaluating physicians. Code § 19.2-176 authorizes the trial court, at any time after conviction but before sentencing, to commit the defendant for a mental health evaluation if the judge "finds reasonable ground to question [the defendant’s] mental state.”

. In her initial interviews with Dr. Fiester and Dr. van Gorp before trial, appellant reported no such child abuse.

. He defined “secondary gain” as a benefit accruing to the patient as a result of the diagnosis other than the benefit to be gained by treatment of the disorder.

. They also testified after appellant’s conviction and used the same background in their revised diagnosis.